# DOLAN *v.* CITY OF TIGARD

No. 93–518.   Argued March 23, 1994—Decided June 24, 1994

Rehnquist, C. J., delivered the opinion of the Court, in which O'Connor, Scalia, Kennedy, and Thomas, JJ., joined. Stevens, J., filed a dissenting opinion, in which Blackmun and Ginsburg, JJ., joined, *post*, p. 396. Souter, J., filed a dissenting opinion, *post*, p. 411.

*David B. Smith* argued the cause and filed briefs for petitioner.

*Timothy V. Ramis* argued the cause for respondent. With him on the brief were *James M. Coleman* and *Richard J. Lazarus*.

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Schiffer, James E. Brookshire,* and *Martin W. Matzen.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Farm Bureau Federation et al. by *James D. Holzhauer, Timothy S. Bishop, John J. Rademacher,* and *Richard L. Krause;* for Defenders of Property Rights et al. by *Nancie G. Marzulla;* for the Georgia Public Policy Foundation et al. by *G. Stephen Parker;* for the Institute for Justice by *William H. Mellor III, Clint Bolick,* and *Richard A. Epstein;* for the National Association of Home Builders et al. by *William H. Ethier, Mary DiCrescenzo,* and *Stephanie McEvily;* for the National Association of Realtors et al. by *Richard M. Stephens;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, Robin L. Rivett, James S. Burling, Deborah J. La Fetra,* and *John M. Groen;* for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar;* for Jon A. Chandler, *pro se;* and for Terence Wellner et al. by *Daniel G. Marsh.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey et al. by *Deborah T. Poritz,* Attorney General of New Jersey, *Jack M. Sabatino* and *Mary Carol Jacobson,* Assistant Attorneys General, and *Rachel J. Horowitz,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Grant Woods* of Arizona, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Elizabeth Barrett-Anderson* of Guam, *Robert A. Marks* of Hawaii, *Michael E. Carpenter* of Maine, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Tom Udall* of New Mexico, *G. Oliver Koppell* of New York, *Lee Fisher* of Ohio, *Jeffrey B. Pine* of Rhode Island, *Charles W. Burson* of Tennessee, *Rosalie S. Ballentine* of the Virgin Islands, and *Joseph B. Meyer* of Wyoming; for the State of Oregon by *Theodore R. Kulongoski,* Attorney General, *Thomas A. Balmer,* Deputy Attorney General, *Virginia L. Linder,* Solicitor General, and *Michael D. Reynolds* and *John T. Bagg,* Assistant Attorneys General; for Broward County by *John J. Copelan, Jr.,* and *Anthony C. Musto;* for the City of New York by *Paul A. Crotty, Leonard J. Koerner,* and *Linda H. Young;* for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg, Walter Kamiat,* and *Laurence Gold;* for the Association of State Floodplain Managers by *Michael J. Bean;* for the Rails-to-Trails Conservancy et al. by *Andrea C. Ferster, Daniel L. Rabinowitz,* and *Glenn P. Sugameli;* for the National Association of Counties et al. by *Richard Ruda, Lee Fennell,* and *Barbara E. Etkind;* for the National Audubon

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner challenges the decision of the Oregon Supreme Court which held that the city of Tigard could condition the approval of her building permit on the dedication of a portion of her property for flood control and traffic improvements. 317 Ore. 110, 854 P. 2d 437 (1993). We granted certiorari to resolve a question left open by our decision in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), of what is the required degree of connection between the exactions imposed by the city and the projected impacts of the pro- posed development.

I

The State of Oregon enacted a comprehensive land use management program in 1973. Ore. Rev. Stat. §§ 197.005–197.860 (1991). The program required all Oregon cities and counties to adopt new comprehensive land use plans that were consistent with the statewide planning goals. §§ 197.175(1), 197.250. The plans are implemented by land use regulations which are part of an integrated hierarchy of legally binding goals, plans, and regulations. §§ 197.175, 197.175(2)(b). Pursuant to the State's requirements, the city of Tigard, a community of some 30,000 residents on the southwest edge of Portland, developed a comprehensive plan and codified it in its Community Development Code (CDC). The CDC requires property owners in the area zoned Central Business District to comply with a 15% open space and landscaping requirement, which limits total site coverage, including all structures and paved parking, to 85% of the parcel. CDC, ch. 18.66, App. to Pet. for Cert. G–16 to G–17. After the completion of a transportation study that identified

Society by *John D. Echeverria;* and for 1000 Friends of Oregon et al. by *H. Bissell Carey III, Dwight H. Merriam,* and *Edward J. Sullivan.*

Briefs of *amici curiae* were filed for the Mountain States Legal Foundation et al. by *William Perry Pendley;* for the Northwest Legal Foundation by *Jeanette R. Burrage;* and for Thomas H. Nelson, *pro se,* et al.

congestion in the Central Business District as a particular problem, the city adopted a plan for a pedestrian/bicycle pathway intended to encourage alternatives to automobile transportation for short trips. The CDC requires that new development facilitate this plan by dedicating land for pedestrian pathways where provided for in the pedestrian/bicycle pathway plan.[1]

The city also adopted a Master Drainage Plan (Drainage Plan). The Drainage Plan noted that flooding occurred in several areas along Fanno Creek, including areas near petitioner's property. Record, Doc. No. F, ch. 2, pp. 2–5 to 2–8; 4–2 to 4–6; Figure 4–1. The Drainage Plan also established that the increase in impervious surfaces associated with continued urbanization would exacerbate these flooding problems. To combat these risks, the Drainage Plan suggested a series of improvements to the Fanno Creek Basin, including channel excavation in the area next to petitioner's property. App. to Pet. for Cert. G–13, G–38. Other recommendations included ensuring that the floodplain remains free of structures and that it be preserved as greenways to minimize flood damage to structures. Record, Doc. No. F, ch. 5, pp. 5–16 to 5–21. The Drainage Plan concluded that the cost of these improvements should be shared based on both direct and indirect benefits, with property owners along the waterways paying more due to the direct benefit that they would receive. *Id.*, ch. 8, p. 8–11. CDC Chapters 18.84 and 18.86

---

[1] CDC §18.86.040.A.1.b provides: "The development shall facilitate pedestrian/bicycle circulation if the site is located on a street with designated bikepaths or adjacent to a designated greenway/open space/park. Specific items to be addressed [include]: (i) Provision of efficient, convenient and continuous pedestrian and bicycle transit circulation systems, linking developments by requiring dedication and construction of pedestrian and bikepaths identified in the comprehensive plan. If direct connections cannot be made, require that funds in the amount of the construction cost be deposited into an account for the purpose of constructing paths." App. to Brief for Respondent B–33 to B–34.

and CDC § 18.164.100 and the Tigard Park Plan carry out these recommendations.

Petitioner Florence Dolan owns a plumbing and electric supply store located on Main Street in the Central Business District of the city. The store covers approximately 9,700 square feet on the eastern side of a 1.67-acre parcel, which includes a gravel parking lot. Fanno Creek flows through the southwestern corner of the lot and along its western boundary. The year-round flow of the creek renders the area within the creek's 100-year floodplain virtually unusable for commercial development. The city's comprehensive plan includes the Fanno Creek floodplain as part of the city's greenway system.

Petitioner applied to the city for a permit to redevelop the site. Her proposed plans called for nearly doubling the size of the store to 17,600 square feet and paving a 39-space parking lot. The existing store, located on the opposite side of the parcel, would be razed in sections as construction progressed on the new building. In the second phase of the project, petitioner proposed to build an additional structure on the northeast side of the site for complementary businesses and to provide more parking. The proposed expansion and intensified use are consistent with the city's zoning scheme in the Central Business District. CDC § 18.66.030, App. to Brief for Petitioner C–1 to C–3.

The City Planning Commission (Commission) granted petitioner's permit application subject to conditions imposed by the city's CDC. The CDC establishes the following standard for site development review approval:

"Where landfill and/or development is allowed within and adjacent to the 100-year floodplain, the City shall require the dedication of sufficient open land area for greenway adjoining and within the floodplain. This area shall include portions at a suitable elevation for the construction of a pedestrian/bicycle pathway within the

floodplain in accordance with the adopted pedestrian/bicycle plan." CDC § 18.120.180.A.8, App. to Brief for Respondent B–45 to B–46.

Thus, the Commission required that petitioner dedicate the portion of her property lying within the 100-year floodplain for improvement of a storm drainage system along Fanno Creek and that she dedicate an additional 15-foot strip of land adjacent to the floodplain as a pedestrian/bicycle pathway.[2] The dedication required by that condition encompasses approximately 7,000 square feet, or roughly 10% of the property. In accordance with city practice, petitioner could rely on the dedicated property to meet the 15% open space and landscaping requirement mandated by the city's zoning scheme. App. to Pet. for Cert. G–28 to G–29. The city would bear the cost of maintaining a landscaped buffer between the dedicated area and the new store. *Id.*, at G–44 to G–45.

Petitioner requested variances from the CDC standards. Variances are granted only where it can be shown that, owing to special circumstances related to a specific piece of the land, the literal interpretation of the applicable zoning provisions would cause "an undue or unnecessary hardship" unless the variance is granted. CDC § 18.134.010, App. to Brief for Respondent B–47.[3] Rather than posing alterna-

---

[2] The city's decision includes the following relevant conditions: "1. The applicant shall dedicate to the City as Greenway all portions of the site that fall within the existing 100-year floodplain [of Fanno Creek] (*i. e.*, all portions of the property below elevation 150.0) and all property 15 feet above (to the east of) the 150.0 foot floodplain boundary. The building shall be designed so as not to intrude into the greenway area." App. to Pet. for Cert. G–43.

[3] CDC § 18.134.050 contains the following criteria whereby the decision-making authority can approve, approve with modifications, or deny a variance request:

"(1) The proposed variance will not be materially detrimental to the purposes of this title, be in conflict with the policies of the comprehensive

tive mitigating measures to offset the expected impacts of her proposed development, as allowed under the CDC, petitioner simply argued that her proposed development would not conflict with the policies of the comprehensive plan. *Id.*, at E–4. The Commission denied the request.

The Commission made a series of findings concerning the relationship between the dedicated conditions and the projected impacts of petitioner's project. First, the Commission noted that "[i]t is reasonable to assume that customers and employees of the future uses of this site could utilize a pedestrian/bicycle pathway adjacent to this development for their transportation and recreational needs." City of Tigard Planning Commission Final Order No. 91–09 PC, App. to Pet. for Cert. G–24. The Commission noted that the site plan has provided for bicycle parking in a rack in front of the proposed building and "[i]t is reasonable to expect that some of the users of the bicycle parking provided for by the site plan will use the pathway adjacent to Fanno Creek if it is constructed." *Ibid.* In addition, the Commission found that creation of a convenient, safe pedestrian/bicycle pathway system as an alternative means of transportation "could

---

plan, to any other applicable policies and standards, and to other properties in the same zoning district or vicinity;

"(2) There are special circumstances that exist which are peculiar to the lot size or shape, topography or other circumstances over which the applicant has no control, and which are not applicable to other properties in the same zoning district;

"(3) The use proposed will be the same as permitted under this title and City standards will be maintained to the greatest extent possible, while permitting some economic use of the land;

"(4) Existing physical and natural systems, such as but not limited to traffic, drainage, dramatic land forms, or parks will not be adversely affected any more than would occur if the development were located as specified in the title; and

"(5) The hardship is not self-imposed and the variance requested is the minimum variance which would alleviate the hardship." App. to Brief for Respondent B–49 to B–50.

offset some of the traffic demand on [nearby] streets and lessen the increase in traffic congestion." *Ibid.*

The Commission went on to note that the required floodplain dedication would be reasonably related to petitioner's request to intensify the use of the site given the increase in the impervious surface. The Commission stated that the "anticipated increased storm water flow from the subject property to an already strained creek and drainage basin can only add to the public need to manage the stream channel and floodplain for drainage purposes." *Id.*, at G–37. Based on this anticipated increased storm water flow, the Commission concluded that "the requirement of dedication of the floodplain area on the site is related to the applicant's plan to intensify development on the site." *Ibid.* The Tigard City Council approved the Commission's final order, subject to one minor modification; the city council reassigned the responsibility for surveying and marking the floodplain area from petitioner to the city's engineering department. *Id.*, at G–7.

Petitioner appealed to the Land Use Board of Appeals (LUBA) on the ground that the city's dedication requirements were not related to the proposed development, and, therefore, those requirements constituted an uncompensated taking of her property under the Fifth Amendment. In evaluating the federal taking claim, LUBA assumed that the city's findings about the impacts of the proposed development were supported by substantial evidence. *Dolan* v. *Tigard*, LUBA 91–161 (Jan. 7, 1992), reprinted at App. to Pet. for Cert. D–15, n. 9. Given the undisputed fact that the proposed larger building and paved parking area would increase the amount of impervious surfaces and the runoff into Fanno Creek, LUBA concluded that "there is a 'reasonable relationship' between the proposed development and the requirement to dedicate land along Fanno Creek for a greenway." *Id.*, at D–16. With respect to the pedestrian/bicycle pathway, LUBA noted the Commission's finding that a signifi-

cantly larger retail sales building and parking lot would attract larger numbers of customers and employees and their vehicles. It again found a "reasonable relationship" between alleviating the impacts of increased traffic from the development and facilitating the provision of a pedestrian/ bicycle pathway as an alternative means of transportation. *Ibid.*

The Oregon Court of Appeals affirmed, rejecting petitioner's contention that in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), we had abandoned the "reasonable relationship" test in favor of a stricter "essential nexus" test. 113 Ore. App. 162, 832 P. 2d 853 (1992). The Oregon Supreme Court affirmed. 317 Ore. 110, 854 P. 2d 437 (1993). The court also disagreed with petitioner's contention that the *Nollan* Court abandoned the "reasonably related" test. 317 Ore., at 118, 854 P. 2d, at 442. Instead, the court read *Nollan* to mean that an "exaction is reasonably related to an impact if the exaction serves the same purpose that a denial of the permit would serve." 317 Ore., at 120, 854 P. 2d, at 443. The court decided that both the pedestrian/bicycle pathway condition and the storm drainage dedication had an essential nexus to the development of the proposed site. *Id.*, at 121, 854 P. 2d, at 443. Therefore, the court found the conditions to be reasonably related to the impact of the expansion of petitioner's business. *Ibid.*[4] We granted certiorari, 510 U. S. 989 (1993), because of an alleged conflict between the Oregon Supreme Court's decision and our decision in *Nollan, supra.*

## II

The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q. R. Co.* v. *Chi-*

---

[4] The Supreme Court of Oregon did not address the consequences of petitioner's failure to provide alternative mitigation measures in her variance application and we take the case as it comes to us. Accordingly, we do not pass on the constitutionality of the city's variance provisions.

*cago,* 166 U. S. 226, 239 (1897), provides: "[N]or shall private property be taken for public use, without just compensation."[5] One of the principal purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960). Without question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred. *Nollan, supra,* at 831. Such public access would deprive petitioner of the right to exclude others, "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna* v. *United States,* 444 U. S. 164, 176 (1979).

On the other side of the ledger, the authority of state and local governments to engage in land use planning has been sustained against constitutional challenge as long ago as our decision in *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926). "Government hardly could go on if to some extent values incident to property could not be diminished

---

[5] JUSTICE STEVENS' dissent suggests that this case is actually grounded in "substantive" due process, rather than in the view that the Takings Clause of the Fifth Amendment was made applicable to the States by the Fourteenth Amendment. But there is no doubt that later cases have held that the Fourteenth Amendment does make the Takings Clause of the Fifth Amendment applicable to the States, see *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104, 122 (1978); *Nollan* v. *California Coastal Comm'n,* 483 U. S. 825, 827 (1987). Nor is there any doubt that these cases have relied upon *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897), to reach that result. See, *e. g., Penn Central, supra,* at 122 ("The issu[e] presented . . . [is] whether the restrictions imposed by New York City's law upon appellants' exploitation of the Terminal site effect a 'taking' of appellants' property for a public use within the meaning of the Fifth Amendment, which of course is made applicable to the States through the Fourteenth Amendment, see *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 239 (1897)").

without paying for every such change in the general law."
*Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413 (1922).
A land use regulation does not effect a taking if it "substan-
tially advance[s] legitimate state interests" and does not
"den[y] an owner economically viable use of his land."
*Agins* v. *City of Tiburon,* 447 U. S. 255, 260 (1980).[6]

The sort of land use regulations discussed in the cases just
cited, however, differ in two relevant particulars from the
present case. First, they involved essentially legislative de-
terminations classifying entire areas of the city, whereas
here the city made an adjudicative decision to condition peti-
tioner's application for a building permit on an individual
parcel. Second, the conditions imposed were not simply a
limitation on the use petitioner might make of her own par-
cel, but a requirement that she deed portions of the property
to the city. In *Nollan, supra,* we held that governmental
authority to exact such a condition was circumscribed by the
Fifth and Fourteenth Amendments. Under the well-settled
doctrine of "unconstitutional conditions," the government
may not require a person to give up a constitutional right—
here the right to receive just compensation when property
is taken for a public use—in exchange for a discretionary
benefit conferred by the government where the benefit
sought has little or no relationship to the property. See
*Perry* v. *Sindermann,* 408 U. S. 593 (1972); *Pickering* v.
*Board of Ed. of Township High School Dist. 205, Will Cty.,*
391 U. S. 563, 568 (1968).

Petitioner contends that the city has forced her to choose
between the building permit and her right under the Fifth

---

[6] There can be no argument that the permit conditions would deprive
petitioner of "economically beneficial us[e]" of her property as she cur-
rently operates a retail store on the lot. Petitioner assuredly is able to
derive *some* economic use from her property. See, *e. g., Lucas* v. *South
Carolina Coastal Council,* 505 U. S. 1003, 1019 (1992); *Kaiser Aetna* v.
*United States,* 444 U. S. 164, 175 (1979); *Penn Central Transp. Co.* v. *New
York City, supra,* at 124.

Amendment to just compensation for the public easements. Petitioner does not quarrel with the city's authority to exact some forms of dedication as a condition for the grant of a building permit, but challenges the showing made by the city to justify these exactions. She argues that the city has identified "no special benefits" conferred on her, and has not identified any "special quantifiable burdens" created by her new store that would justify the particular dedications required from her which are not required from the public at large.

### III

In evaluating petitioner's claim, we must first determine whether the "essential nexus" exists between the "legitimate state interest" and the permit condition exacted by the city. *Nollan,* 483 U. S., at 837. If we find that a nexus exists, we must then decide the required degree of connection between the exactions and the projected impact of the proposed development. We were not required to reach this question in *Nollan,* because we concluded that the connection did not meet even the loosest standard. *Id.,* at 838. Here, however, we must decide this question.

### A

We addressed the essential nexus question in *Nollan.* The California Coastal Commission demanded a lateral public easement across the Nollans' beachfront lot in exchange for a permit to demolish an existing bungalow and replace it with a three-bedroom house. *Id.,* at 828. The public easement was designed to connect two public beaches that were separated by the Nollans' property. The Coastal Commission had asserted that the public easement condition was imposed to promote the legitimate state interest of diminishing the "blockage of the view of the ocean" caused by construction of the larger house.

We agreed that the Coastal Commission's concern with protecting visual access to the ocean constituted a legitimate

public interest. *Id.*, at 835. We also agreed that the permit condition would have been constitutional "even if it consisted of the requirement that the Nollans provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere." *Id.*, at 836. We resolved, however, that the Coastal Commission's regulatory authority was set completely adrift from its constitutional moorings when it claimed that a nexus existed between visual access to the ocean and a permit condition requiring lateral public access along the Nollans' beachfront lot. *Id.*, at 837. How enhancing the public's ability to "traverse to and along the shorefront" served the same governmental purpose of "visual access to the ocean" from the roadway was beyond our ability to countenance. The absence of a nexus left the Coastal Commission in the position of simply trying to obtain an easement through gimmickry, which converted a valid regulation of land use into "'an out-and-out plan of extortion.'" *Ibid.*, quoting *J. E. D. Associates, Inc.* v. *Atkinson*, 121 N. H. 581, 584, 432 A. 2d 12, 14–15 (1981).

No such gimmicks are associated with the permit conditions imposed by the city in this case. Undoubtedly, the prevention of flooding along Fanno Creek and the reduction of traffic congestion in the Central Business District qualify as the type of legitimate public purposes we have upheld. *Agins*, 447 U. S., at 260–262. It seems equally obvious that a nexus exists between preventing flooding along Fanno Creek and limiting development within the creek's 100-year floodplain. Petitioner proposes to double the size of her retail store and to pave her now-gravel parking lot, thereby expanding the impervious surface on the property and increasing the amount of storm water runoff into Fanno Creek.

The same may be said for the city's attempt to reduce traffic congestion by providing for alternative means of transportation. In theory, a pedestrian/bicycle pathway provides a useful alternative means of transportation for workers and shoppers: "Pedestrians and bicyclists occupying dedicated

spaces for walking and/or bicycling . . . remove potential vehicles from streets, resulting in an overall improvement in total transportation system flow." A. Nelson, Public Provision of Pedestrian and Bicycle Access Ways: Public Policy Rationale and the Nature of Private Benefits 11, Center for Planning Development, Georgia Institute of Technology, Working Paper Series (Jan. 1994). See also Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102–240, 105 Stat. 1914 (recognizing pedestrian and bicycle facilities as necessary components of any strategy to reduce traffic congestion).

## B

The second part of our analysis requires us to determine whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact of petitioner's proposed development. *Nollan, supra,* at 834, quoting *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104, 127 (1978) (" '[A] use restriction may constitute a "taking" if not reasonably necessary to the effectuation of a substantial government purpose' "). Here the Oregon Supreme Court deferred to what it termed the "city's unchallenged factual findings" supporting the dedication conditions and found them to be reasonably related to the impact of the expansion of petitioner's business. 317 Ore., at 120–121, 854 P. 2d, at 443.

The city required that petitioner dedicate "to the City as Greenway all portions of the site that fall within the existing 100-year floodplain [of Fanno Creek] . . . and all property 15 feet above [the floodplain] boundary." *Id.,* at 113, n. 3, 854 P. 2d, at 439, n. 3. In addition, the city demanded that the retail store be designed so as not to intrude into the greenway area. The city relies on the Commission's rather tentative findings that increased storm water flow from petitioner's property "can only add to the public need to manage the [floodplain] for drainage purposes" to support its conclusion that the "requirement of dedication of the floodplain area on

the site is related to the applicant's plan to intensify development on the site." City of Tigard Planning Commission Final Order No. 91–09 PC, App. to Pet. for Cert. G–37.

The city made the following specific findings relevant to the pedestrian/bicycle pathway:

> "In addition, the proposed expanded use of this site is anticipated to generate additional vehicular traffic thereby increasing congestion on nearby collector and arterial streets. Creation of a convenient, safe pedestrian/bicycle pathway system as an alternative means of transportation could offset some of the traffic demand on these nearby streets and lessen the increase in traffic congestion." *Id.*, at G–24.

The question for us is whether these findings are constitutionally sufficient to justify the conditions imposed by the city on petitioner's building permit. Since state courts have been dealing with this question a good deal longer than we have, we turn to representative decisions made by them.

In some States, very generalized statements as to the necessary connection between the required dedication and the proposed development seem to suffice. See, *e. g., Billings Properties, Inc.* v. *Yellowstone County*, 144 Mont. 25, 394 P. 2d 182 (1964); *Jenad, Inc.* v. *Scarsdale*, 18 N. Y. 2d 78, 218 N. E. 2d 673 (1966). We think this standard is too lax to adequately protect petitioner's right to just compensation if her property is taken for a public purpose.

Other state courts require a very exacting correspondence, described as the "specifi[c] and uniquely attributable" test. The Supreme Court of Illinois first developed this test in *Pioneer Trust & Savings Bank* v. *Mount Prospect*, 22 Ill. 2d 375, 380, 176 N. E. 2d 799, 802 (1961).[7] Under this standard,

---

[7] The "specifically and uniquely attributable" test has now been adopted by a minority of other courts. See, *e. g., J. E. D. Associates, Inc.* v. *Atkinson*, 121 N. H. 581, 585, 432 A. 2d 12, 15 (1981); *Divan Builders, Inc.* v. *Planning Bd. of Twp. of Wayne*, 66 N. J. 582, 600–601, 334 A. 2d 30, 40

if the local government cannot demonstrate that its exaction is directly proportional to the specifically created need, the exaction becomes "a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations." *Id.*, at 381, 176 N. E. 2d, at 802. We do not think the Federal Constitution requires such exacting scrutiny, given the nature of the interests involved.

A number of state courts have taken an intermediate position, requiring the municipality to show a "reasonable relationship" between the required dedication and the impact of the proposed development. Typical is the Supreme Court of Nebraska's opinion in *Simpson* v. *North Platte*, 206 Neb. 240, 245, 292 N. W. 2d 297, 301 (1980), where that court stated:

> "The distinction, therefore, which must be made between an appropriate exercise of the police power and an improper exercise of eminent domain is whether the requirement has some reasonable relationship or nexus to the use to which the property is being made or is merely being used as an excuse for taking property simply because at that particular moment the landowner is asking the city for some license or permit."

Thus, the court held that a city may not require a property owner to dedicate private property for some future public use as a condition of obtaining a building permit when such future use is not "occasioned by the construction sought to be permitted." *Id.*, at 248, 292 N. W. 2d, at 302.

Some form of the reasonable relationship test has been adopted in many other jurisdictions. See, *e. g., Jordan* v. *Menomonee Falls*, 28 Wis. 2d 608, 137 N. W. 2d 442 (1965); *Collis* v. *Bloomington*, 310 Minn. 5, 246 N. W. 2d 19 (1976) (requiring a showing of a reasonable relationship between

(1975); *McKain* v. *Toledo City Plan Comm'n*, 26 Ohio App. 2d 171, 176, 270 N. E. 2d 370, 374 (1971); *Frank Ansuini, Inc.* v. *Cranston*, 107 R. I. 63, 69, 264 A. 2d 910, 913 (1970).

the planned subdivision and the municipality's need for land); *College Station* v. *Turtle Rock Corp.,* 680 S. W. 2d 802, 807 (Tex. 1984); *Call* v. *West Jordan,* 606 P. 2d 217, 220 (Utah 1979) (affirming use of the reasonable relation test). Despite any semantical differences, general agreement exists among the courts "that the dedication should have some reasonable relationship to the needs created by the [development]." *Ibid.* See generally Note, " 'Take' My Beach Please!": *Nollan* v. *California Coastal Commission* and a Rational-Nexus Constitutional Analysis of Development Exactions, 69 B. U. L. Rev. 823 (1989); see also *Parks* v. *Watson,* 716 F. 2d 646, 651–653 (CA9 1983).

We think the "reasonable relationship" test adopted by a majority of the state courts is closer to the federal constitutional norm than either of those previously discussed. But we do not adopt it as such, partly because the term "reasonable relationship" seems confusingly similar to the term "rational basis" which describes the minimal level of scrutiny under the Equal Protection Clause of the Fourteenth Amendment. We think a term such as "rough proportionality" best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.[8]

---

[8] JUSTICE STEVENS' dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights. See, *e. g., Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926). Here, by contrast, the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. In this situation, the burden properly rests on the city. See *Nollan,* 483 U. S., at 836. This conclusion is not, as he suggests, undermined by our decision in *Moore* v. *East Cleveland,* 431 U. S. 494 (1977), in which we struck down a housing ordinance

JUSTICE STEVENS' dissent relies upon a law review article for the proposition that the city's conditional demands for part of petitioner's property are "a species of business regulation that heretofore warranted a strong presumption of constitutional validity." *Post,* at 402. But simply denominating a governmental measure as a "business regulation" does not immunize it from constitutional challenge on the ground that it violates a provision of the Bill of Rights. In *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307 (1978), we held that a statute authorizing a warrantless search of business premises in order to detect OSHA violations violated the Fourth Amendment. See also *Air Pollution Variance Bd. of Colo.* v. *Western Alfalfa Corp.,* 416 U. S. 861 (1974); *New York* v. *Burger,* 482 U. S. 691 (1987). And in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557 (1980), we held that an order of the New York Public Service Commission, designed to cut down the use of electricity because of a fuel shortage, violated the First Amendment insofar as it prohibited advertising by a utility company to promote the use of electricity. We see no reason why the Takings Clause of the Fifth Amendment, as much a part of the Bill of Rights as the First Amendment or Fourth Amendment, should be relegated to the status of a poor relation in these comparable circumstances. We turn now to analysis of whether the findings relied upon by the city here, first with respect to the floodplain easement, and second with respect to the pedestrian/bicycle path, satisfied these requirements.

It is axiomatic that increasing the amount of impervious surface will increase the quantity and rate of storm water flow from petitioner's property. Record, Doc. No. F, ch. 4,

---

that limited occupancy of a dwelling unit to members of a single family as violating the Due Process Clause of the Fourteenth Amendment. The ordinance at issue in *Moore* intruded on choices concerning family living arrangements, an area in which the usual deference to the legislature was found to be inappropriate. *Id.,* at 499.

p. 4–29. Therefore, keeping the floodplain open and free from development would likely confine the pressures on Fanno Creek created by petitioner's development. In fact, because petitioner's property lies within the Central Business District, the CDC already required that petitioner leave 15% of it as open space and the undeveloped floodplain would have nearly satisfied that requirement. App. to Pet. for Cert. G–16 to G–17. But the city demanded more—it not only wanted petitioner not to build in the floodplain, but it also wanted petitioner's property along Fanno Creek for its greenway system. The city has never said why a public greenway, as opposed to a private one, was required in the interest of flood control.

The difference to petitioner, of course, is the loss of her ability to exclude others. As we have noted, this right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna*, 444 U. S., at 176. It is difficult to see why recreational visitors trampling along petitioner's floodplain easement are sufficiently related to the city's legitimate interest in reducing flooding problems along Fanno Creek, and the city has not attempted to make any individualized determination to support this part of its request.

The city contends that the recreational easement along the greenway is only ancillary to the city's chief purpose in controlling flood hazards. It further asserts that unlike the residential property at issue in *Nollan*, petitioner's property is commercial in character and, therefore, her right to exclude others is compromised. Brief for Respondent 41, quoting *United States* v. *Orito*, 413 U. S. 139, 142 (1973) (" 'The Constitution extends special safeguards to the privacy of the home' "). The city maintains that "[t]here is nothing to suggest that preventing [petitioner] from prohibiting [the easements] will unreasonably impair the value of [her] property as a [retail store]." *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 83 (1980).

Admittedly, petitioner wants to build a bigger store to attract members of the public to her property. She also wants, however, to be able to control the time and manner in which they enter. The recreational easement on the greenway is different in character from the exercise of state-protected rights of free expression and petition that we permitted in *PruneYard.* In *PruneYard,* we held that a major private shopping center that attracted more than 25,000 daily patrons had to provide access to persons exercising their state constitutional rights to distribute pamphlets and ask passers-by to sign their petitions. *Id.,* at 85. We based our decision, in part, on the fact that the shopping center "may restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions." *Id.,* at 83. By contrast, the city wants to impose a permanent recreational easement upon petitioner's property that borders Fanno Creek. Petitioner would lose all rights to regulate the time in which the public entered onto the greenway, regardless of any interference it might pose with her retail store. Her right to exclude would not be regulated, it would be eviscerated.

If petitioner's proposed development had somehow encroached on existing greenway space in the city, it would have been reasonable to require petitioner to provide some alternative greenway space for the public either on her property or elsewhere. See *Nollan,* 483 U. S., at 836 ("Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end"). But that is not the case here. We conclude that the findings upon which the city re-

lies do not show the required reasonable relationship between the floodplain easement and the petitioner's proposed new building.

With respect to the pedestrian/bicycle pathway, we have no doubt that the city was correct in finding that the larger retail sales facility proposed by petitioner will increase traffic on the streets of the Central Business District. The city estimates that the proposed development would generate roughly 435 additional trips per day.[9] Dedications for streets, sidewalks, and other public ways are generally reasonable exactions to avoid excessive congestion from a proposed property use. But on the record before us, the city has not met its burden of demonstrating that the additional number of vehicle and bicycle trips generated by petitioner's development reasonably relate to the city's requirement for a dedication of the pedestrian/bicycle pathway easement. The city simply found that the creation of the pathway "could offset some of the traffic demand . . . and lessen the increase in traffic congestion."[10]

As Justice Peterson of the Supreme Court of Oregon explained in his dissenting opinion, however, "[t]he findings of fact that the bicycle pathway system '*could* offset some of the traffic demand' is a far cry from a finding that the bicycle pathway system *will*, or is *likely to*, offset some of the traffic demand." 317 Ore., at 127, 854 P. 2d, at 447 (emphasis in original). No precise mathematical calculation is required, but the city must make some effort to quantify its findings in

---

[9] The city uses a weekday average trip rate of 53.21 trips per 1,000 square feet. Additional Trips Generated = 53.21 × (17,600 − 9,720). App. to Pet. for Cert. G-15.

[10] In rejecting petitioner's request for a variance from the pathway dedication condition, the city stated that omitting the planned section of the pathway across petitioner's property would conflict with its adopted policy of providing a continuous pathway system. But the Takings Clause requires the city to implement its policy by condemnation unless the required relationship between petitioner's development and added traffic is shown.

support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic demand generated.

## IV

Cities have long engaged in the commendable task of land use planning, made necessary by increasing urbanization, particularly in metropolitan areas such as Portland. The city's goals of reducing flooding hazards and traffic congestion, and providing for public greenways, are laudable, but there are outer limits to how this may be done. "A strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal,* 260 U. S., at 416.

The judgment of the Supreme Court of Oregon is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE GINSBURG join, dissenting.

The record does not tell us the dollar value of petitioner Florence Dolan's interest in excluding the public from the greenway adjacent to her hardware business. The mountain of briefs that the case has generated nevertheless makes it obvious that the pecuniary value of her victory is far less important than the rule of law that this case has been used to establish. It is unquestionably an important case.

Certain propositions are not in dispute. The enlargement of the Tigard unit in Dolan's chain of hardware stores will have an adverse impact on the city's legitimate and substantial interests in controlling drainage in Fanno Creek and minimizing traffic congestion in Tigard's business district. That impact is sufficient to justify an outright denial of her application for approval of the expansion. The city has nev-

ertheless agreed to grant Dolan's application if she will comply with two conditions, each of which admittedly will mitigate the adverse effects of her proposed development. The disputed question is whether the city has violated the Fourteenth Amendment to the Federal Constitution by refusing to allow Dolan's planned construction to proceed unless those conditions are met.

The Court is correct in concluding that the city may not attach arbitrary conditions to a building permit or to a variance even when it can rightfully deny the application outright. I also agree that state court decisions dealing with ordinances that govern municipal development plans provide useful guidance in a case of this kind. Yet the Court's description of the doctrinal underpinnings of its decision, the phrasing of its fledgling test of "rough proportionality," and the application of that test to this case run contrary to the traditional treatment of these cases and break considerable and unpropitious new ground.

I

Candidly acknowledging the lack of federal precedent for its exercise in rulemaking, the Court purports to find guidance in 12 "representative" state court decisions. To do so is certainly appropriate.[1] The state cases the Court consults, however, either fail to support or decidedly undermine the Court's conclusions in key respects.

First, although discussion of the state cases permeates the Court's analysis of the appropriate test to apply in this case, the test on which the Court settles is not naturally derived from those courts' decisions. The Court recognizes as an initial matter that the city's conditions satisfy the "essential nexus" requirement announced in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), because they serve the legitimate interests in minimizing floods and traffic con-

---

[1] Cf. *Moore* v. *East Cleveland*, 431 U. S. 494, 513–521 (1977) (STEVENS, J., concurring in judgment).

gestions. *Ante,* at 387–388.[2] The Court goes on, however, to erect a new constitutional hurdle in the path of these conditions. In addition to showing a rational nexus to a public purpose that would justify an outright denial of the permit, the city must also demonstrate "rough proportionality" between the harm caused by the new land use and the benefit obtained by the condition. *Ante,* at 391. The Court also decides for the first time that the city has the burden of establishing the constitutionality of its conditions by making an "individualized determination" that the condition in question satisfies the proportionality requirement. See *ibid.*

Not one of the state cases cited by the Court announces anything akin to a "rough proportionality" requirement. For the most part, moreover, those cases that invalidated municipal ordinances did so on state law or unspecified grounds roughly equivalent to *Nollan*'s "essential nexus" requirement. See, *e. g., Simpson* v. *North Platte,* 206 Neb. 240, 245–248, 292 N. W. 2d 297, 301–302 (1980) (ordinance lacking "reasonable relationship" or "rational nexus" to property's use violated Nebraska Constitution); *J. E. D. Associates, Inc.* v. *Atkinson,* 121 N. H. 581, 583–585, 432 A. 2d 12, 14–15 (1981) (state constitutional grounds). One case pur-

---

[2] In *Nollan* the Court recognized that a state agency may condition the grant of a land use permit on the dedication of a property interest if the dedication serves a legitimate police-power purpose that would justify a refusal to issue the permit. For the first time, however, it held that such a condition is unconstitutional if the condition "utterly fails" to further a goal that would justify the refusal. 483 U. S., at 837. In the *Nollan* Court's view, a condition would be constitutional even if it required the Nollans to provide a viewing spot for passers-by whose view of the ocean was obstructed by their new house. *Id.,* at 836. "Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end." *Ibid.*

porting to apply the strict "specifically and uniquely attributable" test established by *Pioneer Trust & Savings Bank* v. *Mount Prospect*, 22 Ill. 2d 375, 176 N. E. 2d 799 (1961), nevertheless found that test was satisfied because the legislature had decided that the subdivision at issue created the need for a park or parks. *Billings Properties, Inc.* v. *Yellowstone County*, 144 Mont. 25, 33–36, 394 P. 2d 182, 187–188 (1964). In only one of the seven cases upholding a land use regulation did the losing property owner petition this Court for certiorari. See *Jordan* v. *Menomonee Falls*, 28 Wis. 2d 608, 137 N. W. 2d 442 (1965), appeal dism'd, 385 U. S. 4 (1966) (want of substantial federal question). Although 4 of the 12 opinions mention the Federal Constitution—2 of those only in passing—it is quite obvious that neither the courts nor the litigants imagined they might be participating in the development of a new rule of federal law. Thus, although these state cases do lend support to the Court's reaffirmance of *Nollan*'s reasonable nexus requirement, the role the Court accords them in the announcement of its newly minted second phase of the constitutional inquiry is remarkably inventive.

In addition, the Court ignores the state courts' willingness to consider what the property owner gains from the exchange in question. The Supreme Court of Wisconsin, for example, found it significant that the village's approval of a proposed subdivision plat "enables the subdivider to profit financially by selling the subdivision lots as home-building sites and thus realizing a greater price than could have been obtained if he had sold his property as unplatted lands." *Jordan* v. *Menomonee Falls*, 28 Wis. 2d, at 619–620; 137 N. W. 2d, at 448. The required dedication as a condition of that approval was permissible "[i]n return for this benefit." *Ibid.* See also *Collis* v. *Bloomington*, 310 Minn. 5, 11–13, 246 N. W. 2d 19, 23–24 (1976) (citing *Jordan*); *College Station* v. *Turtle Rock Corp.*, 680 S. W. 2d 802, 806 (Tex. 1984) (dedication requirement only triggered when developer *chooses*

to develop land). In this case, moreover, Dolan's acceptance of the permit, with its attached conditions, would provide her with benefits that may well go beyond any advantage she gets from expanding her business. As the United States pointed out at oral argument, the improvement that the city's drainage plan contemplates would widen the channel and reinforce the slopes to increase the carrying capacity during serious floods, "confer[ring] considerable benefits on the property owners immediately adjacent to the creek." Tr. of Oral Arg. 41–42.

The state court decisions also are enlightening in the extent to which they required that the *entire parcel* be given controlling importance. All but one of the cases involve challenges to provisions in municipal ordinances requiring developers to dedicate either a percentage of the entire parcel (usually 7 or 10 percent of the platted subdivision) or an equivalent value in cash (usually a certain dollar amount per lot) to help finance the construction of roads, utilities, schools, parks, and playgrounds. In assessing the legality of the conditions, the courts gave no indication that the transfer of an interest in realty was any more objectionable than a cash payment. See, *e. g., Jenad, Inc.* v. *Scarsdale,* 18 N. Y. 2d 78, 218 N. E. 2d 673 (1966); *Jordan* v. *Menomonee Falls,* 28 Wis. 2d 608, 137 N. W. 2d 442 (1965); *Collis* v. *Bloomington,* 310 Minn. 5, 246 N. W. 2d 19 (1976). None of the decisions identified the surrender of the fee owner's "power to exclude" as having any special significance. Instead, the courts uniformly examined the character of the entire economic transaction.

## II

It is not merely state cases, but our own cases as well, that require the analysis to focus on the impact of the city's action on the entire parcel of private property. In *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978), we stated that takings jurisprudence "does not divide a single parcel

into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Id.*, at 130–131. Instead, this Court focuses "both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." *Ibid.* *Andrus* v. *Allard*, 444 U. S. 51 (1979), reaffirmed the nondivisibility principle outlined in *Penn Central*, stating that "[a]t least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." 444 U. S., at 65–66.[3] As recently as last Term, we approved the principle again. See *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 644 (1993) (explaining that "a claimant's parcel of property [cannot] first be divided into what was taken and what was left" to demonstrate a compensable taking). Although limitation of the right to exclude others undoubtedly constitutes a significant infringement upon property ownership, *Kaiser Aetna* v. *United States*, 444 U. S. 164, 179–180 (1979), restrictions on that right do not alone constitute a taking, and do not do so in any event unless they "unreasonably impair the value or use" of the property. *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 82–84 (1980).

The Court's narrow focus on one strand in the property owner's bundle of rights is particularly misguided in a case involving the development of commercial property. As Professor Johnston has noted:

> "The subdivider is a manufacturer, processer, and marketer of a product; land is but one of his raw materials. In subdivision control disputes, the developer is

---

[3] Similarly, in *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 498–499 (1987), we concluded that "[t]he 27 million tons of coal do not constitute a separate segment of property for takings law purposes" and that "[t]here is no basis for treating the less than 2% of petitioners' coal as a separate parcel of property."

not defending hearth and home against the king's intrusion, but simply attempting to maximize his profits from the sale of a finished product. As applied to him, subdivision control exactions are actually business regulations." Johnston, Constitutionality of Subdivision Control Exactions: The Quest for A Rationale, 52 Cornell L. Q. 871, 923 (1967).[4]

The exactions associated with the development of a retail business are likewise a species of business regulation that heretofore warranted a strong presumption of constitutional validity.

In Johnston's view, "if the municipality can demonstrate that its assessment of financial burdens against subdividers is rational, impartial, and conducive to fulfillment of authorized planning objectives, its action need be invalidated only in those extreme and presumably rare cases where the burden of compliance is sufficiently great to deter the owner from proceeding with his planned development." Id., at 917. The city of Tigard has demonstrated that its plan is rational and impartial and that the conditions at issue are "conducive to fulfillment of authorized planning objectives." Dolan, on the other hand, has offered no evidence that her burden of compliance has any impact at all on the value or profitability of her planned development. Following the teaching of the cases on which it purports to rely, the Court should not isolate the burden associated with the loss of the power to ex-

---

[4] Johnston's article also sets forth a fair summary of the state cases from which the Court purports to derive its "rough proportionality" test. See 52 Cornell L. Q., at 917. Like the Court, Johnston observed that cases requiring a "rational nexus" between exactions and public needs created by the new subdivision—especially *Jordan* v. *Menomonee Falls*, 28 Wis. 2d 608, 137 N. W. 2d 442 (1965)—"stee[r] a moderate course" between the "judicial obstructionism" of *Pioneer Trust & Savings Bank* v. *Mount Prospect*, 22 Ill. 2d 375, 176 N. E. 2d 799 (1961), and the "excessive deference" of *Billings Properties, Inc.* v. *Yellowstone County*, 144 Mont. 25, 394 P. 2d 182 (1964). 52 Cornell L. Q., at 917.

clude from an evaluation of the benefit to be derived from the permit to enlarge the store and the parking lot.

The Court's assurances that its "rough proportionality" test leaves ample room for cities to pursue the "commendable task of land use planning," *ante*, at 396—even twice avowing that "[n]o precise mathematical calculation is required," *ante*, at 391, 395—are wanting given the result that test compels here. Under the Court's approach, a city must not only "quantify its findings," *ante*, at 395, and make "individualized determination[s]" with respect to the nature *and* the extent of the relationship between the conditions and the impact, *ante*, at 391, 393, but also demonstrate "proportionality." The correct inquiry should instead concentrate on whether the required nexus is present and venture beyond considerations of a condition's nature or germaneness only if the developer establishes that a concededly germane condition is so grossly disproportionate to the proposed development's adverse effects that it manifests motives other than land use regulation on the part of the city.[5] The heightened requirement the Court imposes on cities is even more unjustified when all the tools needed to resolve the questions presented by this case can be garnered from our existing case law.

## III

Applying its new standard, the Court finds two defects in the city's case. First, while the record would adequately support a requirement that Dolan maintain the portion of the floodplain on her property as undeveloped open space, it does not support the additional requirement that the floodplain be dedicated to the city. *Ante*, at 392–395. Second,

---

[5] Dolan's attorney overstated the danger when he suggested at oral argument that without some requirement for proportionality, "[t]he City could have found that Mrs. Dolan's new store would have increased traffic by one additional vehicle trip per day [and] could have required her to dedicate 75, 95 percent of her land for a widening of Main Street." Tr. of Oral Arg. 52–53.

while the city adequately established the traffic increase that the proposed development would generate, it failed to quantify the offsetting decrease in automobile traffic that the bike path will produce. *Ante,* at 395–396. Even under the Court's new rule, both defects are, at most, nothing more than harmless error.

In her objections to the floodplain condition, Dolan made no effort to demonstrate that the dedication of that portion of her property would be any more onerous than a simple prohibition against any development on that portion of her property. Given the commercial character of both the existing and the proposed use of the property as a retail store, it seems likely that potential customers "trampling along petitioner's floodplain," *ante,* at 393, are more valuable than a useless parcel of vacant land. Moreover, the duty to pay taxes and the responsibility for potential tort liability may well make ownership of the fee interest in useless land a liability rather than an asset. That may explain why Dolan never conceded that she could be prevented from building on the floodplain. The city attorney also pointed out that absent a dedication, property owners would be required to "build on their own land" and "with their own money" a storage facility for the water runoff. Tr. of Oral Arg. 30–31. Dolan apparently "did have that option," but chose not to seek it. *Id.,* at 31. If Dolan might have been entitled to a variance confining the city's condition in a manner this Court would accept, her failure to seek that narrower form of relief at any stage of the state administrative and judicial proceedings clearly should preclude that relief in this Court now.

The Court's rejection of the bike path condition amounts to nothing more than a play on words. Everyone agrees that the bike path "could" offset some of the increased traffic flow that the larger store will generate, but the findings do not unequivocally state that it *will* do so, or tell us just how many cyclists will replace motorists. Predictions on such matters are inherently nothing more than estimates. Cer-

tainly the assumption that there will be an offsetting benefit here is entirely reasonable and should suffice whether it amounts to 100 percent, 35 percent, or only 5 percent of the increase in automobile traffic that would otherwise occur. If the Court proposes to have the federal judiciary micromanage state decisions of this kind, it is indeed extending its welcome mat to a significant new class of litigants. Although there is no reason to believe that state courts have failed to rise to the task, property owners have surely found a new friend today.

## IV

The Court has made a serious error by abandoning the traditional presumption of constitutionality and imposing a novel burden of proof on a city implementing an admittedly valid comprehensive land use plan. Even more consequential than its incorrect disposition of this case, however, is the Court's resurrection of a species of substantive due process analysis that it firmly rejected decades ago.[6]

The Court begins its constitutional analysis by citing *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 239 (1897), for the proposition that the Takings Clause of the Fifth Amendment is "applicable to the States through the Fourteenth Amendment." *Ante,* at 383. That opinion, however, contains no mention of either the Takings Clause or the Fifth Amendment;[7] it held that the protection afforded by the Due Process Clause of the Fourteenth Amendment extends to matters of substance as well as procedure,[8] and that the sub-

---

[6] See, *e. g., Ferguson* v. *Skrupa,* 372 U. S. 726 (1963).

[7] An earlier case deemed it "well settled" that the Takings Clause "is a limitation on the power of the Federal government, and not on the States." *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, 177 (1872).

[8] The Court held that a State "may not, by any of its agencies, disregard the prohibitions of the Fourteenth Amendment. Its judicial authorities may keep within the letter of the statute prescribing forms of procedure in the courts and give the parties interested the fullest opportunity to be heard, and yet it might be that its final action would be inconsistent with that amendment. In determining what is due process of law regard must

stance of "the due process of law enjoined by the Fourteenth. Amendment requires compensation to be made or adequately secured to the owner of private property taken for public use under the authority of a State." 166 U. S., at 235, 236–241. It applied the same kind of substantive due process analysis more frequently identified with a better known case that accorded similar substantive protection to a baker's liberty interest in working 60 hours a week and 10 hours a day. See *Lochner* v. *New York*, 198 U. S. 45 (1905).[9]

Later cases have interpreted the Fourteenth Amendment's substantive protection against uncompensated deprivations of private property by the States as though it incorporated the text of the Fifth Amendment's Takings Clause. See, *e. g., Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 481, n. 10 (1987). There was nothing problematic about that interpretation in cases enforcing the Fourteenth Amendment against state action that involved the actual physical invasion of private property. See *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419, 427–433 (1982); *Kaiser Aetna* v. *United States,* 444 U. S., at 178–180. Justice Holmes charted a significant new course, however, when he opined that a state law making it "commercially impracticable to mine certain coal" had "very nearly the same effect for constitutional purposes as appropriating or destroying it." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 414 (1922). The so-called "regulatory

be had to substance, not to form." *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 234–235 (1897).

[9] The *Lochner* Court refused to presume that there was a reasonable connection between the regulation and the state interest in protecting the public health. 198 U. S., at 60–61. A similar refusal to identify a sufficient nexus between an enlarged building with a newly paved parking lot and the state interests in minimizing the risks of flooding and traffic congestion proves fatal to the city's permit conditions in this case under the Court's novel approach.

takings" doctrine that the Holmes dictum[10] kindled has an obvious kinship with the line of substantive due process cases that *Lochner* exemplified. Besides having similar ancestry, both doctrines are potentially open-ended sources of judicial power to invalidate state economic regulations that Members of this Court view as unwise or unfair.

This case inaugurates an even more recent judicial innovation than the regulatory takings doctrine: the application of the "unconstitutional conditions" label to a mutually beneficial transaction between a property owner and a city. The Court tells us that the city's refusal to grant Dolan a discretionary benefit infringes her right to receive just compensation for the property interests that she has refused to dedicate to the city "where the property sought has little or no relationship to the benefit."[11] Although it is well settled that a government cannot deny a benefit on a basis that infringes constitutionally protected interests—"especially [one's] interest in freedom of speech," *Perry* v. *Sindermann,* 408 U. S. 593, 597 (1972)—the "unconstitutional conditions" doctrine provides an inadequate framework in which to analyze this case.[12]

---

[10] See *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S., at 484 (explaining why this portion of the opinion was merely "advisory").

[11] *Ante,* at 385. The Court's entire explanation reads: "Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property."

[12] Although it has a long history, see *Home Ins. Co.* v. *Morse,* 20 Wall. 445, 451 (1874), the "unconstitutional conditions" doctrine has for just as long suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question. See, *e. g.,* Sunstein, Why the Unconstitutional Conditions Doctrine is an Anachronism, 70 B. U. L. Rev. 593, 620 (1990) (doctrine is "too crude and too general to provide help in contested cases"); Sullivan, Unconstitutional

Dolan has no right to be compensated for a taking unless the city acquires the property interests that she has refused to surrender. Since no taking has yet occurred, there has not been any infringement of her constitutional right to compensation. See *Preseault* v. *ICC*, 494 U. S. 1, 11–17 (1990) (finding takings claim premature because property owner had not yet sought compensation under Tucker Act); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 294–295 (1981) (no taking where no one "identified any property . . . that has allegedly been taken").

Even if Dolan should accept the city's conditions in exchange for the benefit that she seeks, it would not necessarily follow that she had been denied "just compensation" since it would be appropriate to consider the receipt of that benefit in any calculation of "just compensation." See *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S., at 415 (noting that an "average reciprocity of advantage" was deemed to justify many laws); *Hodel* v. *Irving*, 481 U. S. 704, 715 (1987) (such "'reciprocity of advantage'" weighed in favor of a statute's consti-

---

Conditions, 102 Harv. L. Rev. 1415, 1416 (1989) (doctrine is "riven with inconsistencies"); Hale, Unconstitutional Conditions and Constitutional Rights, 35 Colum. L. Rev. 321, 322 (1935) ("The Supreme Court has sustained many such exertions of power even after announcing the broad doctrine that would invalidate them"). As the majority's case citations suggest, *ante,* at 385, modern decisions invoking the doctrine have most frequently involved First Amendment liberties, see also, *e. g., Connick* v. *Myers,* 461 U. S. 138, 143–144 (1983); *Elrod* v. *Burns,* 427 U. S. 347, 361–363 (1976) (plurality opinion); *Sherbert* v. *Verner,* 374 U. S. 398, 404 (1963); *Speiser* v. *Randall,* 357 U. S. 513, 518–519 (1958). But see *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.,* 478 U. S. 328, 345–346 (1986) ("[T]he greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling"). The necessary and traditional breadth of municipalities' power to regulate property development, together with the absence here of fragile and easily "chilled" constitutional rights such as that of free speech, make it quite clear that the Court is really writing on a clean slate rather than merely applying "well-settled" doctrine. *Ante,* at 385.

tutionality). Particularly in the absence of any evidence on the point, we should not presume that the discretionary benefit the city has offered is less valuable than the property interests that Dolan can retain or surrender at her option. But even if that discretionary benefit were so trifling that it could not be considered just compensation when it has "little or no relationship" to the property, the Court fails to explain why the same value would suffice when the required nexus is present. In this respect, the Court's reliance on the "unconstitutional conditions" doctrine is assuredly novel, and arguably incoherent. The city's conditions are by no means immune from constitutional scrutiny. The level of scrutiny, however, does not approximate the kind of review that would apply if the city had insisted on a surrender of Dolan's First Amendment rights in exchange for a building permit. One can only hope that the Court's reliance today on First Amendment cases, see *ante*, at 385 (citing *Perry* v. *Sindermann, supra*, and *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968)), and its candid disavowal of the term "rational basis" to describe its new standard of review, see *ante*, at 391, do not signify a reassertion of the kind of superlegislative power the Court exercised during the *Lochner* era.

The Court has decided to apply its heightened scrutiny to a single strand—the power to exclude—in the bundle of rights that enables a commercial enterprise to flourish in an urban environment. That intangible interest is undoubtedly worthy of constitutional protection—much like the grandmother's interest in deciding which of her relatives may share her home in *Moore* v. *East Cleveland*, 431 U. S. 494 (1977). Both interests are protected from arbitrary state action by the Due Process Clause of the Fourteenth Amendment. It is, however, a curious irony that Members of the majority in this case would impose an almost insurmountable burden of proof on the property owner in the *Moore* case

while saddling the city with a heightened burden in this case.[13]

In its application of what is essentially the doctrine of substantive due process, the Court confuses the past with the present. On November 13, 1922, the village of Euclid, Ohio, adopted a zoning ordinance that effectively confiscated 75 percent of the value of property owned by the Ambler Realty Company. Despite its recognition that such an ordinance "would have been rejected as arbitrary and oppressive" at an earlier date, the Court (over the dissent of Justices Van Devanter, McReynolds, and Butler) upheld the ordinance. Today's majority should heed the words of Justice Sutherland:

> "Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract

---

[13] The author of today's opinion joined Justice Stewart's dissent in *Moore* v. *East Cleveland*, 431 U. S. 494 (1977). There the dissenters found it sufficient, in response to my argument that the zoning ordinance was an arbitrary regulation of property rights, that "if the ordinance is a rational attempt to promote 'the city's interest in preserving the character of its neighborhoods,' *Young* v. *American Mini Theatres, [Inc.,]* 427 U. S. 50, 71 (opinion of STEVENS, J.), it is . . . a permissible restriction on the use of private property under *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, and *Nectow* v. *Cambridge,* 277 U. S. 183." *Id.,* at 540, n. 10. The dissent went on to state that my calling the city to task for failing to explain the need for enacting the ordinance *"place[d] the burden on the wrong party." Ibid.* (emphasis added). Recently, two other Members of today's majority severely criticized the holding in *Moore.* See *United States* v. *Carlton,* 512 U. S. 26, 40–42 (1994) (SCALIA, J., concurring in judgment); see also *id.,* at 39 (SCALIA, J., concurring in judgment) (calling the doctrine of substantive due process "an oxymoron").

to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise." *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 387 (1926).

In our changing world one thing is certain: uncertainty will characterize predictions about the impact of new urban developments on the risks of floods, earthquakes, traffic congestion, or environmental harms. When there is doubt concerning the magnitude of those impacts, the public interest in averting them must outweigh the private interest of the commercial entrepreneur. If the government can demonstrate that the conditions it has imposed in a land use permit are rational, impartial and conducive to fulfilling the aims of a valid land use plan, a strong presumption of validity should attach to those conditions. The burden of demonstrating that those conditions have unreasonably impaired the economic value of the proposed improvement belongs squarely on the shoulders of the party challenging the state action's constitutionality. That allocation of burdens has served us well in the past. The Court has stumbled badly today by reversing it.

I respectfully dissent.

JUSTICE SOUTER, dissenting.

This case, like *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), invites the Court to examine the relationship between conditions imposed by development permits, requiring landowners to dedicate portions of their land for use by the public, and governmental interests in mitigating the adverse effects of such development. *Nollan* declared the need for a nexus between the nature of an exaction of an interest in land (a beach easement) and the nature of governmental interests. The Court treats this case as raising a further question, not about the nature, but about the degree, of connection required between such an exaction and the

adverse effects of development. The Court's opinion announces a test to address this question, but as I read the opinion, the Court does not apply that test to these facts, which do not raise the question the Court addresses.

First, as to the floodplain and greenway, the Court acknowledges that an easement of this land for open space (and presumably including the five feet required for needed creek channel improvements) is reasonably related to flood control, see *ante*, at 387, 392–393, but argues that the "permanent recreational easement" for the public on the greenway is not so related, see *ante*, at 393–395. If that is so, it is not because of any lack of proportionality between permit condition and adverse effect, but because of a lack of any rational connection at all between exaction of a public recreational area and the governmental interest in providing for the effect of increased water runoff. That is merely an application of *Nollan*'s nexus analysis. As the Court notes, "[i]f petitioner's proposed development had somehow encroached on existing greenway space in the city, it would have been reasonable to require petitioner to provide some alternative greenway space for the public." *Ante*, at 394. But that, of course, was not the fact, and the city of Tigard never sought to justify the public access portion of the dedication as related to flood control. It merely argued that whatever recreational uses were made of the bicycle path and the 1-foot edge on either side were incidental to the permit condition requiring dedication of the 15-foot easement for an 8-foot-wide bicycle path and for flood control, including open space requirements and relocation of the bank of the river by some 5 feet. It seems to me such incidental recreational use can stand or fall with the bicycle path, which the city justified by reference to traffic congestion. As to the relationship the Court examines, between the recreational easement and a purpose never put forth as a justification by the city, the Court unsurprisingly finds a recreation area to be unrelated to flood control.

Second, as to the bicycle path, the Court again acknowledges the "theor[etically]" reasonable relationship between "the city's attempt to reduce traffic congestion by providing [a bicycle path] for alternative means of transportation," *ante*, at 387, and the "correct" finding of the city that "the larger retail sales facility proposed by petitioner will increase traffic on the streets of the Central Business District," *ante*, at 395. The Court only faults the city for saying that the bicycle path "could" rather than "would" offset the increased traffic from the store, *ante*, at 396. That again, as far as I can tell, is an application of *Nollan*, for the Court holds that the stated connection ("could offset") between traffic congestion and bicycle paths is too tenuous; only if the bicycle path "would" offset the increased traffic by some amount could the bicycle path be said to be related to the city's legitimate interest in reducing traffic congestion.

I cannot agree that the application of *Nollan* is a sound one here, since it appears that the Court has placed the burden of producing evidence of relationship on the city, despite the usual rule in cases involving the police power that the government is presumed to have acted constitutionally.* Having thus assigned the burden, the Court concludes that the city loses based on one word ("could" instead of "would"), and despite the fact that this record shows the connection the Court looks for. Dolan has put forward no evidence that

---

*See, *e. g.*, *Goldblatt* v. *Hempstead*, 369 U. S. 590, 594–596 (1962); *United States* v. *Sperry Corp.*, 493 U. S. 52, 60 (1989). The majority characterizes this case as involving an "adjudicative decision" to impose permit conditions, *ante*, at 391, n. 8, but the permit conditions were imposed pursuant to Tigard's Community Development Code. See, *e. g.*, § 18.84.040, App. to Brief for Respondent B–26. The adjudication here was of Dolan's requested variance from the permit conditions otherwise required to be imposed by the Code. This case raises no question about discriminatory, or "reverse spot," zoning, which "singles out a particular parcel for different, less favorable treatment than the neighboring ones." *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 132 (1978).

the burden of granting a dedication for the bicycle path is unrelated in kind to the anticipated increase in traffic congestion, nor, if there exists a requirement that the relationship be related in degree, has Dolan shown that the exaction fails any such test. The city, by contrast, calculated the increased traffic flow that would result from Dolan's proposed development to be 435 trips per day, and its Comprehensive Plan, applied here, relied on studies showing the link between alternative modes of transportation, including bicycle paths, and reduced street traffic congestion. See, *e. g.*, App. to Brief for Respondent A–5, quoting City of Tigard's Comprehensive Plan (" 'Bicycle and pedestrian pathway systems will result in some reduction of automobile trips within the community' "). *Nollan,* therefore, is satisfied, and on that assumption the city's conditions should not be held to fail a further rough proportionality test or any other that might be devised to give meaning to the constitutional limits. As Members of this Court have said before, "the common zoning regulations requiring subdividers to . . . dedicate certain areas to public streets, are in accord with our constitutional traditions because the proposed property use would otherwise be the cause of excessive congestion." *Pennell* v. *San Jose,* 485 U. S. 1, 20 (1988) (SCALIA, J., concurring in part and dissenting in part). The bicycle path permit condition is fundamentally no different from these.

In any event, on my reading, the Court's conclusions about the city's vulnerability carry the Court no further than *Nollan* has gone already, and I do not view this case as a suitable vehicle for taking the law beyond that point. The right case for the enunciation of takings doctrine seems hard to spot. See *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003, 1076 (1992) (statement of SOUTER, J.).