652 So.2d 1247 (1995)
SARASOTA COUNTY, a Political Subdivision of the State of Florida, Appellant,
v.
TAYLOR WOODROW HOMES LIMITED, n/k/a Taywood Homes Limited (Inc.), a Corporation Organized under the Laws of Great Britain and Authorized to do Business in the State of Florida, and Meadowood Utilities Company, a Florida Corporation, Appellees.
No. 94-01381.
District Court of Appeal of Florida, Second District.
April 7, 1995.
*1248 Robert L. Nabors and Virginia Saunders Delegal, Nabors, Giblin & Nickerson, P.A., Tallahassee, and Jorge L. Fernandez, County Atty., Sarasota, for appellant.
S.W. Moore, Brigham Moore Gaylord Schuster & Merlin, Sarasota, for appellees.
ALTENBERND, Judge.
Sarasota County (the County) appeals an order dismissing with prejudice its complaint for declaratory relief and specific performance against Taylor Woodrow Homes Limited and Meadowood Utilities Company. We reverse because the complaint alleged a contract between the County and Taylor Woodrow Homes that, on its face, could be specifically enforced. Without regard to the ultimate interpretation that the trial court may give to this contract, we conclude that the County is entitled to a declaratory judgment of its rights and obligations under the contract. It is possible that Taylor Woodrow Homes can raise constitutional issues that will prevent enforcement of this contract. *1249 We conclude, however, that Taylor Woodrow Homes must raise those issues as a defense to this action, and the County must be given an opportunity to allege waiver or estoppel in reply. These issues are sufficiently unique and complex that neither the trial court nor this court can declare the applicable law without additional development of the facts.
Taylor Woodrow Homes is a land development company. During the last twenty years, it has developed a large project in Sarasota County known as The Meadows. This development involves over 1,300 acres and includes single-family, two-family, and multi-family residences, as well as a golf course and a commercial complex. When completed, the development will have approximately 4,900 housing units, providing homes for about 13,000 residents.[1]
The Meadows was conceived in the early 1970s as a planned use development and is one of this region's first major developments of regional impact. At that time, the Florida Environmental Land and Water Management Act of 1972, sections 380.012-380.10, Florida Statutes (1973), and the procedures for developments of regional impact were quite new. Sarasota County had been given expanded authority to place restrictions, stipulations, and safeguards into a change of zoning for a development, and those stipulations were intended to be contractual in nature between the County and the developer. Ch. 71-916, Laws of Fla. During that period of growing environmental concern, the County enacted ordinance 72-30 to establish a county water and sewer utility system, and prepared a master plan that allegedly contemplated a future waste water system entirely owned and operated by the public.
Although the negotiations and administrative proceedings that preceded this development are not extensively described in this record, it is clear that the County and Taylor Woodrow Homes reached an agreement to rezone the property and proceed with the development. To rezone the property to a R-2S-PUD classification and to approve a development of regional impact, the Sarasota County Commission passed resolution 74-238 on November 13, 1974. This resolution is a 28-page document that includes many conditions and restrictions on the development of The Meadows. It places certain obligations on the County, as well as on Taylor Woodrow Homes. Paragraph 7 of this resolution contains agreements relating to a waste water treatment system. That paragraph is recited in its entirety in appendix A to this opinion. In summary, the paragraph recognizes that a publicly owned waste water treatment system was not available to The Meadows in 1974. The County authorized Taylor Woodrow Homes to build a facility at its own expense and to operate that system privately. Paragraph 7 also explains that the County would eventually proceed with a public facility in the region. If Taylor Woodrow Homes was still developing The Meadows when the county elected to proceed with a public system to service The Meadows area, "then upon request by the County, [Taylor Woodrow Homes] agrees that the aforementioned privately owned waste water treatment system (including the treatment plant and all collection lines, lift stations and other equipment) will be dedicated to the County without charge and free of encumbrance."
This 1974 resolution was executed by Taylor Woodrow Homes, acknowledging that the terms, conditions, and provisions of the resolution were binding upon the developer, its successors and assigns. Moreover, this resolution contains provisions noting: (1) it was a negotiated agreement embodying the entire contract between the parties; (2) the conditions of the resolution may be enforced by either party in an action at law or equity; and (3) the terms and conditions constitute a basis upon which the developer and the County may rely in future actions necessary to implement fully the final development contemplated by the resolution.
In December 1975, about one year after this resolution was executed, the County *1250 granted a franchise to Taylor Woodrow Homes to provide waste water treatment within The Meadows for a period of twenty years. This franchise agreement does not appear to alter the contractual terms of resolution 74-238, and expressly provides that it is not a bar to the acquisition of the system by the County or any other governmental agency by lawful means.
The development of The Meadows apparently proceeded without significant legal complication for the next eighteen years. Although section 380.08, Florida Statutes (1973), would have allowed Taylor Woodrow Homes to challenge any regulation or order that it regarded as unduly restrictive, there is no indication that Taylor Woodrow Homes ever attempted to disavow its obligations concerning the waste water treatment system or that it ever filed suit to rescind or modify its agreement to dedicate the system to the County upon request. In September 1993, the Board of County Commissioners of Sarasota County adopted resolution 93-194, exercising its right to request a dedication of the system. Taylor Woodrow Homes declined to dedicate the property to the County, taking the position that the request was an unauthorized and unconstitutional taking of private property under the police powers of the state.
The County then filed this action seeking a declaration of its rights under the resolution and specific enforcement of its right to dedication under paragraph 7 of the resolution. Taylor Woodrow Homes convinced the trial court that the contract was unenforceable unless the County alleged and proved three essential predicates: (1) a legislative authorization for a mandatory dedication; (2) an enacting ordinance setting out the procedures for such a dedication; and (3) a rational nexus between the dedication required and the negative impact on the community caused by the prospective development, which impact would be relieved by the required exaction. The trial court decided that the County's amended complaint failed to allege the second and third predicates, and dismissed the amended complaint with prejudice.
We are troubled by the absence of facts in this case. We know nothing about the negotiations underlying this contract. We do not know whether the residents in this region of Sarasota County have already paid utility rates intended to compensate for this anticipated dedication to the County. The record does not disclose whether the accounting for this system used depreciation methods or other procedures to offset the expected transfer of the system to the public. The pleadings do not describe what detrimental steps, if any, were taken by the County and other governmental agencies in reliance upon the contractual agreement of Taylor Woodrow Homes. We cannot determine whether the County is exercising its option in good faith as a proper step in the creation of a public waste water system.
In legal argument, each side suggests that the other side is acting unfairly and in bad faith. There is nothing in our record to support these accusations, nor are they material to the legal question of whether the contract and this dispute warrant a declaratory judgment. Thus, in significant part, our reversal arises from the view that these difficult legal issues can be better addressed if the facts and circumstances of the last twenty years are in the record.
This case presents complex legal issues. Taylor Woodrow Homes wishes to analyze the case as a constitutional taking occurring in 1993. The County sees the matter as enforcement of a contractual concession reasonably made by Taylor Woodrow Homes without protest under 1974 law. Generally, the judiciary cannot allow any governmental agency, including Sarasota County, to take private property without due process or just compensation. It is equally true, as a general proposition, that any party to a valid contract, including Taylor Woodrow Homes, can be expected to abide by the terms of the contract, especially if it executed the agreement without protest twenty years ago and has accepted the benefits of that contract. We conclude Taylor Woodrow Homes is entitled to the benefit of current *1251 constitutional case law, but it must establish that the factual circumstances in 1974 rendered its agreement invalid at that time. Although we do not regard these issues as barred by any statute of limitations, the County has the right to raise issues in the nature of waiver and estoppel under these circumstances.
From the perspective of pleading a cause of action, the dispositive issue on appeal is whether the County's initial complaint must allege more than the existence of a justiciable dispute under a facially valid contract in order to entitle it to declaratory relief. We conclude that the County's complaint is sufficient and has alleged a contractual dispute requiring declaratory relief. It is Taylor Woodrow Homes' obligation to raise in its answer any constitutional issue that may render the contract unenforceable. The County will then have an opportunity to raise factual issues of waiver and estoppel in reply.
The trial court examined the contract and the law in effect in 1974 and, by dismissing the complaint, essentially declared that the dedication provision in paragraph 7 was void ab initio, as a matter of law. Although we do not preclude the trial court from determining that the contract is currently voidable based upon a consideration of all the factual circumstances, we conclude that the 1974 contract cannot be declared void in the 1990s based merely on the pleadings.
We do not dispute that certain provisions within such a contract can be facially invalid. For example, if the County had compelled Taylor Woodrow Homes to discriminate against a racial minority group, there is no question that such clause, affecting the constitutional rights of third parties, would be facially invalid. In this case, however, the County had the right to include stipulations relating to waste water in the contract. It had the right to request Taylor Woodrow Homes to voluntarily transfer property within the development to the County. Whether this dedication requirement was an excessive regulation under the constitution and under section 380.08 cannot be resolved on the face of the contract. Moreover, in the negotiations for this major long-term development, Taylor Woodrow Homes rationally could have waived its personal constitutional right to compensation for this specific property. City of Treasure Island v. Strong, 215 So.2d 473 (Fla. 1968). See also In re Shambow's Estate, 153 Fla. 762, 15 So.2d 837 (1943) (constitutional rights which are personal may be waived); see generally 16 Am.Jur.2d Constitutional Law § 205-211 (1979). Likewise, to avoid unnecessary delay, it could have dispensed with the need for an ordinance setting out procedures for an acceptable dedication.
We recognize the recent line of cases holding that the government cannot compel a person to give up a constitutional right to property in exchange for a discretionary benefit where the property sought has little relationship to the benefit. See Dolan v. City of Tigard, ___ U.S. ___, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Likewise, we understand that a county cannot condition the issuance of a permit upon a specific condition without establishing an essential nexus between that condition and a legitimate state interest. Dolan, ___ U.S. ___, 114 S.Ct. 2309, 129 L.Ed.2d 304. In addition to this essential nexus, a county that conditions a permit upon a dedication of private property is now required to make an individualized determination that there exists a "rough proportionality" between the dedication and the nature and extent of the impact of the proposed development. Dolan, ___ U.S. ___, 114 S.Ct. 2309, 129 L.Ed.2d 304; see Lee County v. New Testament Baptist Church of Fort Myers, Fla., Inc., 507 So.2d 626 (Fla. 2d DCA), review denied, 515 So.2d 230 (Fla. 1987).
We do not suggest that a developer waives these rights by agreeing to conditions, perhaps under protest, and then filing an action to determine the constitutionality of those *1252 conditions.[2]See Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass'n, 245 So.2d 625 (Fla. 1971); Admiral Dev. Corp. v. City of Maitland, 267 So.2d 860 (Fla. 4th DCA 1972). We recognize Taylor Woodrow Homes' argument that it had no need to file suit unless and until the County formally requested the dedication. However, we are troubled by the concept that a developer can delay testing the conditions of its permit for a generation under these circumstances. We are concerned that Taylor Woodrow Homes may well have received benefits by not raising these issues in 1975 and that the citizens of Sarasota County may have acted to their detriment over the last twenty years in reliance upon the validity of this contract. If Taylor Woodrow Homes desired an individualized determination of rough proportionality concerning this dedication, then it may have had an obligation to request that determination many years ago.[3]
Even at this late date, based only on these pleadings, there would appear to have been an essential nexus between the development of this sizable community in 1974 and the need for a sewer system in that location. A permit authorizing the building of such a huge development would necessarily result in the need for a sewer system. Thus, conditioning a permit in 1974 upon a proper plan for a sewer system would not seem to violate the essential nexus requirement.
If that nexus existed in 1974, then the next question that needed to be addressed at that time was whether "rough proportionality" existed between the impact of the proposed project and a dedication by which the developer would provide the sewer system free of charge to the County. Given that nothing in life is free, such a dedication would appear to require the developer to pass the costs of the system on to the new residents either through the sales price of the real property or through county authorized utility rates. This issue of rough proportionality cannot be decided as a matter of law upon the existing pleadings.
Taylor Woodrow Homes argues that there is no rational nexus or rough proportionality in 1993 between this dedication and the development because the existing system is privately owned and is adequately handling the waste water generated by the development. These factual matters, of course, are not within this record. Moreover, Taylor Woodrow Homes' analysis seems to examine the situation as a forced taking in 1993, rather than as a condition of a permit in 1974. It may be entitled to have its 1974 agreement analyzed under current constitutional case law, but the circumstances it challenges are those that existed at the time of its contract, not at the time the County chose to enforce the contract.
Both parties have assisted this court by filing briefs that are thorough and professional. Nevertheless, they have not brought to our attention a case that involves comparable facts, including such a lengthy delay between the execution of the contract and the developer's challenge to its constitutionality. In this case, a good-sized community has been built upon the basis of this contract. It may well be that this clause is severable and circumstances still warrant the trial court's refusal to enforce the clause. The law that is applicable to these circumstances should await a better understanding of the facts.
Reversed and remanded.
SCHOONOVER, A.C.J., and LAZZARA, J., concur.

APPENDIX A

(EXCERPT FROM 1974 DEVELOPER AGREEMENT)
7. The parties hereto recognize that under the existing Regional Water Quality *1253 Management Plan, this area is eventually to be served by the City of Sarasota Regional Waste Water Treatment Plant. However, since such plans are in a preliminary stage and development of at least a part of The Meadows will take place prior to implementation of such plans, the parties do hereby agree as follows:
(a) Until such time as a publicly owned waste water treatment system becomes available, developer shall be authorized to construct at its expense and operate a privately owned waste water treatment plant and system, such plant to be located on the 60 acre parcel of land located on the south side of 17th Street as reflected on the conceptual plan. For access from said treatment plant to The Meadows, County agrees to grant to developer appropriate easements under and along 17th Street for the installation of collection lines and appurtenances. Developer shall further have the right to reserve appropriate easements in any of the streets and roads to be dedicated or granted to the County under the terms of this agreement for the purpose of constructing and maintaining sewer lines, lift stations and other equipment necessary for the operation of said privately owned waste water treatment system.
(b) At such time as regional waste water treatment facilities are capable of properly serving The Meadows and trunk or collection lines and appurtenances of sufficient size and capacity to service The Meadows are installed and available to the developer's treatment plant on 17th Street, developer agrees to discontinue utilization of such privately owned facility and to tie into and connect with said public facility at no expense to the County or to the City. It is further understood and agreed that there will be no tap-in or connection fee levied against either the developer or individual owners of land or units in The Meadows by any governmental body insofar as the required tap-in or connection fee pertains to the installation of collection lines and appurtenances (that is to say, the developer or individual land or unit owners may be charged only that portion of the required tap-in or connection fee allocated to construction of the treatment facility). Developer further agrees to transfer all of its existing customers to said public facility. When this connection is completed, the developer further agrees to dedicate the aforementioned 60 acre utility site to the Board of County Commissioners for utilization as a public park (which shall be deemed to include the right for the County to use said land for cultural or recreational facilities).
(c) In the event the aforementioned regional waste water treatment system is not developed or does not become available to The Meadows during the period of time that developer is developing The Meadows and if this Board should decide to proceed during said period of time with a public system to service The Meadows area, then upon request by the County, developer agrees that the aforementioned privately owned waste water treatment system (including the treatment plant and all collection lines, lift stations and other equipment) will be dedicated to the County without charge and free of encumbrance. The parties recognize the fact that at the time the County requests the aforementioned dedication, only a portion of The Meadows may have been developed and connected to such system and that it may therefore be necessary to enlarge the treatment plant periodically thereafter in order to service additional customers of The Meadows. The parties further agree that such enlargement may properly be accomplished in several incremental stages. Therefore, if at the time of such dedication all units proposed for this project have not been substantially completed and connected to such system, then at such subsequent time or times as the expansion of such plant may be necessary in order to continue to service The Meadows, the County will obtain bids for the proposed incremental expansion of such treatment facility and developer agrees to contribute a sum equivalent to the lowest bid in order to provide the funding necessary to expand *1254 such plant to the capacity required to service those units to be developed in the next stage or stages of The Meadows; it being specifically understood and agreed, however, that (1) developer or one of its subsidiaries may submit bids for such construction work; and (2) if such system is to be used by the County to furnish service to customers residing outside of The Meadows in addition to customers in The Meadows, then the cost of expanding the plant to the required capacity shall be prorated between developer and the County in the same proportion as the required capacity to meet the demands of nonresidents of The Meadows bears to the total capacity of the plant.
(d) Upon dedication of said plant or said utility site, as aforesaid, and acceptance thereof by the County, County covenants and agrees that it will continue to service existing and future customers in The Meadows complex at customary rates and will make no separate charge to new customers within the development for tie-in or connection.
(e) It is understood by developer that the dedication of sewer collection lines, lift stations and other equipment to the County will likewise include appropriate easements under and across all private roads in The Meadows to the property lines of individually owned properties for the purposes of permitting access to and maintenance of such lines.
NOTES
[1] We emphasize that no evidence has been presented in this case. The facts described in this opinion are derived from the pleadings and various record documents.
[2] Taylor Woodrow Homes suggests that it signed this contract in 1974 under duress. This is not an issue that can be resolved on the face of the County's complaint.
[3] The analysis of this case is further complicated by the rapid development of the law of just compensation in the last generation. It is likely that one or both parties are now raising legal issues to support or challenge this contract that no lawyer would have raised in 1974.