[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action commenced by a two count complaint dated September 22, 1986, the plaintiffs, John and Katherine Hutchinson, seek damages and an injunction against the defendant Town of Andover (Town). The plaintiffs claim that the Town has improperly maintained and permitted drainage of surface water onto their property and house lot located on Bunker Hill Road in the defendant Town. In Count One of their complaint, the plaintiffs allege, inter alia, that the Town permits and maintains drainage of surface water onto their property at various locations on the southerly side of Bunker Hill Road, and CT Page 263 that such drainage into, upon, and through the Plaintiffs' property is not done in such a way as to do the least damage to such land. In Count Two, the plaintiff Katherine Hutchinson alleges that she is the owner of land and appurtenances comprising a house lot located on Bunker Hill Road in the defendant Town, and that the Town has permitted and maintained drainage of surface water onto the plaintiff's house lot where it abuts Bunker Hill Road.
Service of process was made on the Town on September 29, 1986, and the defendant filed an answer dated September 2, 1987.
In its answer to Count One of the complaint, the Town admitted the plaintiffs' ownership of the property and the Town's maintenance of Bunker Hill Road as a Town road. Additionally, the Town admitted that it permits and maintains drainage of surface water onto the plaintiffs' property at specified locations on the southerly side of Bunker Hill Road, and that the drainage first occurred prior to October 1, 1981 and continued through the date of the complaint.
As to Count Two, the Town admitted that the lot owned by the plaintiff Katherine Hutchinson is a house lot, and the Town acknowledged that it maintained Bunker Hill Road as a Town Road. The Town also admitted that it permitted and maintained drainage of surface water from Bunker Hill Road onto this house lot.
By pleading dated November 8, 1986, the Town filed a Special Defense alleging that it had acquired a drainage easement by prescription over the plaintiffs' property.
The trial of this action took place over several days during which the court heard oral testimony and received numerous documents into evidence. Based on the evidence adduced at trial, the court makes the following findings and orders.
On August 29, 1959, the plaintiffs acquired several acres of property on Bunker Hill Road in the defendant Town. While it is unnecessary to recite a detailed legal description of the property, a pertinent portion of the plaintiffs' property abuts the southerly edge of Bunker Hill Road, a town road maintained by the defendant Town. Starting from the plaintiffs' property line with an abutting neighbor, MacDonald, the plaintiffs' property runs in a westerly direction for approximately 2300 feet along the southerly edge of Bunker Hill Road to its intersection with CT Page 264 the Hop River. The river crosses Bunker Hill Road and flows in a southerly direction through a westerly portion of the plaintiffs' property.
The plaintiffs' property is located in an area designated R-80 for Town zoning purposes.
Starting from a point approximately 1700 feet east of the plaintiffs' property line with MacDonald, and then continuing along the plaintiffs' northerly boundary, Bunker Hill Road slopes downhill from east to west from an elevation of approximately 546.5 feet to an elevation of approximately 290 feet where it intersects the Hop River.
The Town has periodically resurfaced Bunker Hill Road using a material known as chip seal. In addition, during winter storms, the Town spreads sand mixed with salt on Bunker Hill Road for the safety of motorists.
During 1960 and 1961, the plaintiffs built a house on a portion of this property, and on August 31, 1961, the plaintiff John Hutchinson quit claimed a house lot to the plaintiff Katherine Hutchinson. This lot, which is a portion of the property originally purchased by the plaintiffs in 1959, includes the home built by the plaintiffs and contains approximately 250 feet of frontage on Bunker Hill Road. The plaintiffs occupy the home and house lot as their primary residence.
From the crest of Bunker Hill Road downhill to the MacDonald-Hutchinson property line, the Town has constructed no drainage ditches or catch basins on or near the road to drain surface water off the road or to capture flow from the road and from land north and south of the road.
Prior to 1959, the Town created six drainage sites on Bunker Hill Road which has caused surface water on Bunker Hill Road to drain onto the property subsequently purchased by the plaintiffs. At the trial, the plaintiffs' introduced a map into evidence which shows the location of their property and Bunker Hill Road. cf. Plaintiffs' Exhibit 5, map dated March 6, 1989 and prepared by Holmes Henry Associates. This map also shows the location of the drainage sites constructed and maintained by the Town. Additionally, during the trial, the Town introduced, as an exhibit, a written plan of remediation in the form of a letter authored by Glenn Mirtl of Fuss O'Neill Inc. cf. Defendant's CT Page 265 Exhibit A, letter of July 11, 1996. In this letter, Mr. Mirtl refers to each drainage area by number. For the sake of clarity and consistency, the court follows the numbering system utilized by Mr. Mirtl.
The first area, referred to as drainage area six, is a drainage ditch, or leak off, located on the south side of Bunker Hill Road on the plaintiffs' property approximately 200 feet west of its boundary with MacDonald. This leak off collects surface flow from the southerly edge of Bunker Hill Road. The water that flows into this drainage ditch travels in a westerly direction down Bunker Hill Road from a high point approximately 1500 feet east of the Hutchinson-MacDonald boundary. In the main, this water consists of storm run-off. Water and water-borne road sediment collected at this point enter the plaintiffs' property through the leak off constructed by the Town and then course over the plaintiffs' property. While some of this run-off travels toward and into an existing wetland on the plaintiffs' property, other channels created by this leak off move in a southwesterly direction south of the house lot. The velocity and volume of this flow has caused the removal of top soil, and further soil erosion by scouring and channeling the land. In addition, portions of the road surface, chip seal, and road sediment have been carried by this surface flow more than 400 feet into the plaintiffs' property. One witness, soil scientist John Ianni, testified credibly that on a recent inspection he discovered the presence of pea stone gravel approximately 650 feet from the leak off site on Bunker Hill Road, with pieces of pavement from the road approximately 250 feet into the plaintiffs' property.
Drainage area five consists of a cement culvert running under Bunker Hill Road from its northerly edge to its southerly side and emptying into a drainage pool on the plaintiffs' property adjacent to the road. This site is located approximately 350 feet west of the Hutchinson-MacDonald boundary line. This culvert collects gutter flow which has run along the northern edge of Bunker Hill Road from driveways and land east and north of the plaintiffs' boundary line with MacDonald, as well as surface flow from land north of the plaintiffs' but west of their property line with MacDonald. While the Town maintains the culvert and cleans out the drainage pool annually, evidence adduced at the trial satisfies the court that the drainage pool does not capture and retain the surface water run-off and road sediment at this drainage site. Rather, the court finds, from credible evidence of leaf litter, chip seal, and road sediment on the plaintiffs' CT Page 266 property, that surface water and water-borne road sediment travel substantially beyond the drainage pool away from Bunker Hill Road into the plaintiffs' property causing erosion of the soil as well as sediment deposits. The court credits the testimony of the plaintiff, Katherine Hutchinson, that some of the run-off collected at this discharge point ultimately merges with flowage from the leak off described as drainage area six. Additionally, the court credits, as accurate, testimony that the velocity and volume of water flowing into this culvert, and then into and out of the drainage pool, has caused channelization and scouring of the land and removal of its top soil.
Drainage area four is located approximately 620 feet west of the MacDonald-Hutchinson property line. This drainage site consists of a catch basin located on the northerly side of Bunker Hill Road, connected to a culvert that runs under Bunker Hill Road and discharges into a drainage pool on the plaintiffs' property adjacent to the road. Surface water flow and water-borne road sediment from Bunker Hill Road and from land north of the road flow into the drainage pool constructed at this site. However, this drainage pool does not retain the water and the sediment it collects. Rather, water and water-borne road sediment courses from the drainage ditch in a southerly direction onto the plaintiffs' property, causing soil erosion and channeling of the land.
Drainage area three consists of a culvert which crosses Bunker Hill Road approximately 925 feet west of the Hutchinson-MacDonald property line and discharges into a drainage pool on the plaintiffs' property adjacent to the road. This drainage site, which is approximately 100 feet east of the property line of the house lot on Bunker Hill Road, collects surface water flow and surface water-borne road sediment from Bunker Hill Road and surface water from land north of the plaintiffs' property. The water and road sediment that flow through this culvert and discharge into a drainage pool are not contained in the drainage pool. The water and water-borne road sediment flow from the drainage pool in a southwesterly direction onto the plaintiff Katherine Hutchinson's house lot close to the family residence. Eugene Sammartino, a real estate broker, builder, and developer, testified credibly that on a recent inspection of the property, he discovered the presence of accretion deposits of road sediment at a distance of approximately two hundred feet southwest of this discharge point on Bunker Hill Road, toward the plaintiffs' home. Flowage from this drainage point causes the rear, or southerly CT Page 267 side, of the house lot to be wet and diminishes its recreational use.
Drainage area two consists of a culvert below and across Bunker Hill Road approximately 1360 feet west of the MacDonald-Hutchinson property line, approximately 200 feet west of the driveway leading to the plaintiff's house. This culvert collects surface water from Bunker Hill Road and drains onto the plaintiffs' property adjacent to the Road. The court heard no evidence specific to this drainage area except testimony that the down hill slope of the land southwest of this drainage area becomes steeper beyond the present area affected by drainage. The court credits, as reliable, trial testimony that because of the steep slope to the southwest of this drainage area, a substantial increase in the volume of surface water discharged to this area would likely cause soil erosion.
Finally, drainage area one is located approximately 1930 feet west of the MacDonald-Hutchinson property line and consists of a culvert transecting Bunker Hill Road. This culvert discharges surface water and water-borne road sediment it collects from Bunker Hill Road and from land north of the plaintiffs' into a swale which traverses the plaintiffs' property across a flood plain in a southwesterly direction toward the Hop River.
While the plaintiffs' property at the location of drainage areas one through five is wooded, drainage area six is located in a meadow currently utilized by the plaintiffs as a hay field. The court heard no evidence of damage caused to the plaintiffs' property from this discharge point.
During the construction of their house, the plaintiffs had an artesian well on the house lot pounded to a depth of approximately 140 feet to supply household water. While the casing for the well is approximately 45 feet, the lower portion of the well hole is encased in bedrock. The court finds from the credible evidence that this well water has been infiltrated as a result of run off of road salt spread by the Town on Bunker Hill Road during winter storms. This salt, which is carried off by surface water onto drainage culverts, ditches, and pools constructed by the Town, mixes with the bedrock causing a leaching out of iron and manganese. As a result, tests of the household water reveal the presence of unacceptably high levels of iron, manganese, and sodium. Analysis of the household water conducted in October 1990 by the Columbia Environmental CT Page 268 Laboratory showed that the water contained .06 parts manganese, .37 parts iron, and a sodium level of 23 against recommended maximum levels of .050 for manganese, .3 for iron, and 20 for sodium. Subsequent household water testing by the Ellis A. Tarlton Laboratory in 1993 for the presence of chlorides and sodium revealed chloride content of 59 milligrams per liter and sodium content of 33 milligrams per liter, both values substantially in excess of recommended levels. While the duration of this problem is uncertain, the court finds that the presence of the unacceptably high levels of these minerals in the plaintiffs' water supply is a direct consequence of the Town's use of salt, the gathering of the salt in road surface water run off, and the collection of this run off at drainage sites constructed by the Town.
Although the court believes, from the evidence, that run off from drainage site three is likely the primary cause of these infiltrates in the plaintiffs' water supply, the court accepts as reasonable the testimony of Ellis Tarlton that the presence of road salt in waters flowing from discharge areas four, five, and six can not be ruled out because flowage from these areas, coursing in a southwesterly direction toward the plaintiffs' home, appears to co-mingle and seep into the ground.
The plaintiffs have suffered damages as a consequence of the presence unacceptably high levels of iron, manganese, chloride, and sodium in their household water. For health reasons, the plaintiffs have been required to purchase bottled water for their consumption over the past five years at a total cost to them of approximately nine hundred ($900) dollars. The plaintiff Katherine Hutchinson also demonstrated from photographs that the bathroom toilet has become discolored over the past five years. The court accepts, as reliable, the testimony of Ellis Tarlton, that the high iron and manganese content of the household water is a direct consequence of the presence of road salt in the run off which has infiltrated the plaintiffs' water supply, and this presence has caused the discoloration depicted by the plaintiff.
At the trial, there was oral testimony as well as the introduction of two contoured maps, from which the court finds that the natural direction of the flow of surface water in the vicinity of the plaintiffs' property and Bunker Hill Road is from northeast to southwest. cf. Plaintiffs' Exhibit 5, Plan of Holmes Henry Associates; Plaintiffs' Exhibit 12, Portion of Topographical map showing numbered contour lines. From the CT Page 269 evidence adduced at trial, the court is satisfied that Bunker Hill Road is a conduit for the flowage of surface water, and the Town drains surface water from Bunker Hill Road onto the plaintiffs' property at the leak off and at all five culvert locations. The court also finds that this collection and dissemination of surface water by the Town at six discharge points interferes with and alters the natural sheet flow of surface water over the plaintiffs' property. Additionally, the court finds that the Town, in its construction of these drainage sites, has created watercourses over the plaintiffs' property. The court further finds that the flowage of water and road sediment at drainage sites six, five, four, and three causes damage to the plaintiffs' property by erosion and scouring of the soil, and the creation of channels. The court also finds that the construction of the drainage system as described has resulted in the drainage of surface water onto the plaintiff's house lot.
The court finds, from the credible evidence of Katherine Hutchinson, John Ianni, and Gene Sammartino, that the destruction of top soil, the erosion, scouring, and channelization of the land caused by the Town's drainage system, increased substantially from 1989 to 1996, reaching further into the plaintiffs' property in south and southwesterly directions from drainage sites six, five, four, and three. And, the court finds that the flowage from these discharge points, if not abated, will continue to damage the plaintiffs' property at an accelerating rate by further erosion of top soil, scouring, and channelization of the land.
On the other hand, the court believes, based on testimony adduced at the trial, that if a system to drain surface flow from Bunker Hill Road is properly configured, constructed, and maintained, the land will become restored to reasonable use within a few years.
C.G.S. § 13a-138 provides, in part, that the Town may ". . . make or clear any watercourse or place for draining off the water therefrom into or through any person's land so far as necessary to drain off such water and, when it is necessary to make any drain upon or through any person's land for the purpose named in this section, it shall be done in such way as to do the least damage to such land." As to the plaintiffs' acreage, the statute establishes a two prong test: whether it was necessary for the Town to construct the sites to drain water off Bunker Hill Road and adjacent properties onto the plaintiffs' property, CT Page 270 and, if so, whether the Town acted in such a way to cause the least damage to the plaintiffs' property.
With respect to the house lot, C.G.S. § 13a-138 provides, ". . . (b) Nothing in this section shall be so construed as to allow the drainage of water from such highways into, upon, through or under the yard of any dwelling house . . ." This section sets up the one test of simply determining whether the Town has caused drainage of water from the highway onto the house lot owned by the plaintiff Katherine Hutchinson.
As a preliminary matter, the Town claims that it has acquired an easement by prescription to cause flowage of surface water from Bunker Hill Road over the plaintiffs' property. The court rejects this Special Defense as legally untenable. Recently, the Supreme Court rejected a similar special defense, equating a municipal defendant to a riparian owner. The court cited its earlier statement in Lawton v. Herrick, 83 Conn. 417 (1910), that: "[a] riparian proprietor cannot acquire by any prescription a right to maintain a nuisance . . . Platt Bros. Co. v.Waterbury, 72 Conn. 531, 548, 45 A. 499 [1896]. The claim of such a right in another's land is unnatural and unreasonable, and is not sanctioned by law. A prescription to be valid must be reasonable. Merwin Wheeler, 41 Conn. 13, 25 [1874]." Hillman v.Greenwich, 217 Conn. 520, 530 (1991).
The defendant does not acquire any prescriptive rights by reason of the provisions of C.G.S. § 13a-138. In Postemski v.Watrous, the Supreme Court explicitly rejected this construction given to § 13-18 of the General Statutes, the predecessor to C.G.S. § 13a-138. 151 Conn. 183 (193). The court stated: "The effect which the trial court gives to the statute embraces a construction which, over the years, we have carefully avoided. InTorrington v. Messenger, 74 Conn. 321, 50 A. 873, we pointed out that the statute is in derogation of private rights and therefore should be strictly construed against its grant of power . . . If the statute is construed as creating a right in the land which diminishes its value and thereby constitutes an encumbrance, its constitutionality would be open to serious question as permitting a taking of private property without compensation. On the other hand, if it is construed only as a limitation on the state's liability for concentrating the discharge of surface water upon the land of a private owner in derogation of the common law, it has a firmer basis." Id at 187-188. The defendant Town has acquired no rights by prescription to cause flowage of surface CT Page 271 water onto the plaintiffs' property.
While the defendant Town did not raise the Statute of Limitations as a special defense, at trial the Town argued that the plaintiffs can not recover because they have not proven that any damage from the Town's drainage system to their property occurred prior to the commencement of this action. C.G.S. §13a-138a, enacted in 1981, provides in part that: "No action shall be brought by the owner of land adjoining a public highway . . . for recovery of damage to such property . . . by reason of any draining of water into or through such land by any town . . . pursuant to subsection (a) of section 13a-138, but within fifteen years next after the first occurrence of such drainage, except that if such drainage first occurred prior to October 1, 1981, no such action shall be brought after October 1, 1986." It is uncontested that the town installed the drainage system prior to 1981. Contrary to the argument advanced by the Town, the statute requires the plaintiffs to prove the existence of drainage, but not consequential damage, prior to 1981. The court views this statute as a further limitation of the Town's liability, protecting it from liability after October 1, 1986 for drainage which first occurred prior to 1981. In this case, while the exact dates of construction of the drainage system are uncertain, the plaintiffs have alleged and the defendant has admitted that it took place prior to 1981. Drainage onto the plaintiffs' property from the drainage system constructed by the Town took place prior to 1981. The claim is not time-barred.
And, there is no reasonable basis for the court to conclude that the plaintiffs are required to prove that the damage from the drainage created prior to 1981 occurred prior to their commencement of suit. Evidence of extant damage is part of the plaintiffs' proof that the drainage was not done in such a way as to do the least damage to the land. With respect to Count Two, the plaintiff need only prove that the Town drains water through the yard of her home.
In their complaint, the plaintiffs have not alleged that it was unnecessary for the Town to cause drainage onto their property. Indeed, in their trial brief, the plaintiffs state, "The plaintiffs are not arguing that it is unnecessary to drain the highway surface water upon their property." Brief of the Plaintiffs', p. 4, November 12, 1996. Rather, the core of the plaintiffs' complaint concerning their acreage, apart from the house lot, is that the Town did not construct the drainage sites CT Page 272 in the manner as to do the least damage to their property.
In the absence of the immunity afforded a municipality under C.G.S. § 13a-138 and C.G.S. § 13a-138a, the Town would be liable to the plaintiffs for the collection of surface water and for discharging it upon their property in an artificial volume. In Postemski v. Watrous, the Supreme Court stated: "At common law a landowner cannot collect surface water in an artificial volume and turn it from its natural course in an increased volume upon his neighbor's land to the neighbor's substantial injury . . . The same rule applies to a governmental agency engaged in the maintenance of a highway. Bryne v. Farmington, 64 Conn. 367, 374,30 A. 138." 151 Conn. 183, 188 (1963). C.G.S. § 13a-138 is not a grant of authority. It is a limited grant of immunity to a municipality responsible for the maintenance of highways to cause drainage onto private property, but only when necessary, and then, only when accomplished in a manner so as to cause the least damage to the property. Postemski v. Watrous, supra151 Conn. at 188. With respect to the general liability of a landowner who collects and diverts surface water onto an adjacent landowner's property, the Court has opined: "The general principles of law relating to such a situation, gathered from our cases, may be stated as follows: A land-owner cannot collect surface water in an artificial volume and turn it from its natural course in an increased volume upon his neighbor's land to his substantial injury . . . This is true although no more water is collected than would have naturally flowed upon the property in a diffused condition, for it is evident that, while a given piece of land may receive a large amount of surface water without injury thereto, when it gently flows thereon from natural causes, yet when collected and discharged in considerable volume at a given point, it may become very destructive and injurious." Melin v.Richman, 96 Conn. 686, 688 (1921). In this instance, the defendant Town has collected surface water in an artificial volume on Bunker Hill Road, and the Town has turned it from its natural course by directing it along Bunker Hill Road in an increased volume and then upon the plaintiffs' land in concentrated volume and increased velocity through the six specified drainage sites to the plaintiffs' substantial injury.
In support of their claim that the Town did not construct and maintain the drainage system so as to cause the least damage to their property, the plaintiffs have proffered a plan prepared by Donald Holmes, a civil engineer. The plaintiffs claim that the implementation of the Holmes plan would cause the least damage to CT Page 273 their property, and would stop the drainage of surface water from Bunker Hill Road onto the house lot. At trial, Mr. Holmes presented a plan to construct a series of catch basins along Bunker Hill Road connected to a continuous road culvert along the southerly edge of the road adjacent to the plaintiffs' property. This culvert would ultimately discharge at the bottom of the hill into a sediment pool that would drain into the plaintiffs' meadow adjacent to the Hop River. While Mr. Holmes did not state the precise cost of this undertaking, the court heard credible evidence that its cost would be approximately $100,000 to $115,000.
Without conceding liability, the Town proffered an alternative plan. Glen Mirtl, a civil engineer with the firm of Fuss and O'Neill, proposes that the Town install a cross culvert at drainage site six on the north side of Bunker Hill Road. The purpose of this culvert would be to capture and redirect the surface flow coursing down Bunker Hill Road from its crest east of the Hutchinson's property into the existing leak off. Mr. Mirtl would then eliminate drainage site five. He proposes to enlarge the sediment pool at drainage site four, while eliminating drainage site three which drains onto the house lot. Mr. Mirtl's reasons for the elimination of drainage at site three are that the sodium content of the well increased from 1990 to 1993, and that the elimination of the site would decrease the runoff to the area of the house. Defendant's Exhibit A, Letter of Glen Mirtl, dated July 11, 1996. As to the drainage presently collected at site three, Mr. Mirtl proposes to pipe it through a culvert to drainage site two, west of the house lot, and to increase the size of the sedimentation pool at site two. Finally, Mr. Mirtl indicated his belief that no remediation is needed at site one.
The plaintiffs' response to the Town's plan is that, if implemented, it will not cause the least damage to their land, and that it will not cause a cessation of drainage onto the house lot. In support of this position, the plaintiffs adduced credible testimony that the increased flowage at the leak off at drainage site six envisioned by Mr. Mirtl's plan would have a harmful thermal effect on the existing wetland and would cause further channelization and erosion to the soils in that portion of their property. The plaintiffs adduced further credible testimony that increased drainage at site two would cause erosion because there is steep grade southwest and downhill from this site. Additionally, the court credits testimony adduced by the CT Page 274 plaintiffs that the proposed expansion of sediment ponds at sites four and two would not be adequate to contain the run off of surface water and water-borne road sediment deleterious to their property. Finally, the plaintiffs claim that the defendant's plan, while eliminating two of the existing drainage sites, would increase the velocity and volume of flow at the existing drainage sites six, four, and three, thereby likely causing further damage to their property by erosion. From the evidence adduced at trial, the court credits, as well-founded, the plaintiffs' concerns regarding Mr. Mirtl's plan. The court finds that implementation of the defendant's plan would not cause the least damage to the plaintiffs' land. Given the topography of the property, the court is also of the view that the defendant's plan is likely to continue the redirection of surface water drainage onto the house lot.
While cost estimates for the defendant's plan are imprecise, the defendant believes that its plan is more economically feasible than the plaintiffs'. The defendant asks the court to consider the relative costs of the respective plans in making its adjudication. In assessing the defendant's claim in this regard, the court credits, as reliable, the testimony of First Selectman Edward Turn that the town of Andover is a rural community with an overall Town budget of $5,500,000. The highway department, which has the responsibility for maintenance of approximately 30 miles of Town roads, has a crew of three and an annual budget of approximately $358,000. While the court credits, as accurate, Mr. Turn's testimony that the cost of the plaintiffs' proposal could have the impact of one mill on the town's tax rate if funds for the project had to be raised through taxation, the evidence is disputed as to whether the Town, in fact, has adequate funds in reserves to implement the plaintiffs' proposed remedy.
Testimony concerning the Town's financial structure raises the issue of whether it is appropriate for the court to consider the Town's financial means as part of its assessment of whether the Town constructed the drainage system in a manner as to cause the least damage to the plaintiffs' land. Resolution of this issue requires analysis of the applicable statute as well as a more general consideration of the parameters of the Town's right to cause drainage of surface water onto private property.
At the outset, the court notes that the Town has a duty to maintain Town highways. cf. C.G.S. § 13a-99. The Supreme Court has opined: "In maintaining and repairing the highways CT Page 275 within their limits, municipalities act as agents of the State in the performance of a public duty, a duty imposed upon them by the State for the benefit of the general public. They are for that reason, in the absence of any statute creating any such liability, not responsible in damages for the consequential injuries to private property abutting upon the highway, which flow from or are incident to the performance of such duty."Rudnyai v. Harwinton, 79 Conn. 91, 94 (1906) In stating this proposition of the municipality's immunity from liability, however, the Court noted the distinction between governmental and ministerial acts. The Court stated: "But municipal immunity from liability for injuries resulting from the maintenance and repairs of highways, does not extend beyond the governmental duty imposed by the State." Id. 95. The Court continued: "The statute imposing upon towns the duty of building and repairing necessary highways within their respective limits does not authorize them, in the discharge of that duty, for the purpose of protecting their highways from surface water, to make use of the adjoining private property by constructing sluices and drains upon it, or by discharging upon it, by means of sluices or ditches or other structures designed for that purpose, the surface water which has accumulated because of the manner in which the road has been constructed, or has been collected by means of gutters or ditches on the sides of the roads. (citations omitted) When a municipality directs the performance of such an act, not within the scope of the imposed governmental duty, it becomes liable like any other wrong-does for the resulting injury." Id.
In construing C.G.S. § 13a-138 and its antecedents as granting a municipality an immunity from liability for doing, in the exercise of its governmental responsibility, what a private owner could not, the Supreme Court has taken care to construe the statute's grant of power narrowly. In Torrington v. Messenger,
the Court opined: "It should be borne in mind also, in reading this statute, that it is one in derogation of private rights, and therefore should be strictly construed against its grant of power." 74 Conn. 321, 325 (1902).
The court's determination to confine a Town's authority to that expressly given by the statute appears not to reflect a desire to bridle the exercise of governmental action, but to uphold the constitutionality of the statute as not permitting the taking of private property without compensation. Thus, the Court in Postemski stated; "Clearly, its language must be kept within such bounds that it shall not authorize the taking of private CT Page 276 property without due process of law and just compensation. It seems quite apparent that if full meaning and scope is to be given to the language employed, as the ordinary man might read it, rights would be conferred which it would be hard to defend as unconstitutional limitations." Postemski v. Watrous, supra,151 Conn. at 187.
Reading the statute in this light, it would be improper for the court to consider the relative costs to the Town of the plaintiffs' and defendant's remedial proposals, if execution of one of the proposals would cause less damage to the plaintiffs' property. The court finds, as fact, that execution of the plaintiffs' proposal would cause the least damage to the plaintiffs' property, and that their proposal is most likely to eliminate artificial drainage of surface water onto the house lot.
There is an insufficient nexus between the Town's desire to contain the public cost of road maintenance and its duty to cause the least damage in the manner of its intrusion onto the plaintiffs' property. cf, Dolan v. City of Tigard, 512 U.S. 374, (1994); Nollan v. California Coastal Commission, 483 U.S. 825
(1987). (cf. also, Reis, Connecticut Water Law: JudicialAllocation of Water Resources, pp. 173-178 (1967) for some discussion of the constitutional frailty of C.G.S. §13a-138.)
Indeed, recent determinations by the United States Supreme Court that the excessive regulation of private property may constitute a taking, coupled with decisions concerning the nature of an intrusion that will constitute a taking, may heighten judicial concern for the constitutional viability of C.G.S. §13a-138. cf. Lucas v. South Carolina Coastal Council, 505 U.S. 1003
(1992); Dolan v. City of Tigard, supra; Nollan v. CaliforniaCoastal Commission, supra; First Lutheran Church v. L.A. County,482 U.S. 304 (1987). In Loretto v. Teleprompter Manhattan CATVCorp, a case dealing with a state statute requiring a landowner to permit a cable television company to install CATV facilities upon his property, the U.S. Supreme Court, in finding that the statutory authority constituted a taking, stated: "To the extent that the government permanently occupies physical property, it effectively destroys the owner's rights to possess, use, and dispose of the property . . . And constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied." 458 U.S. 419, 435-438
CT Page 277 (1982).
In this case, the court finds that the intrusion upon the plaintiffs' property is permanent in the sense that the point of discharge system installed by the Town has permanently altered the flow of surface water and diverted it upon the plaintiffs' property in such a manner that it has eroded and channelized the property, thereby creating watercourses upon the plaintiffs' property. While some intrusion on the plaintiffs' property may be justified by the necessity to drain surface water from Bunker Hill, the extant system is not configured so as to cause the least damage to the plaintiffs' property. To allow the present system to continue under the authority of C.G.S. § 13a-138 on the basis that the least damaging system is too expensive would impermissibly place the property rights of the plaintiffs in competition with the general economic interests of the Town. The cost of maintaining Andover's roads is a proper public cost. It is a price the taxpayers pay for the safety of the community's roads.
The defendant further claims that in order to be liable for damages to the plaintiffs or to be subject to an injunction, the court must find that the construction of the drainage system diverting surface water onto the plaintiffs' property was not accomplished, at the time of construction, so as to cause the least damage. The Town asserts that since the plaintiffs did not adduce evidence as to when the drainage system was actually constructed, and what reasonable alternatives existed at that time, the court is unable to make a determination that the Town did not act in a way so as to cause the least damage to the plaintiffs' property. The short answer to this claim is that the Town misconstrues C.G.S. § 13a-138 (b) as a grant of authority rather than a limitation on its liability. The court reads the statute as granting a limited immunity from liability to a Town for the construction as well as the maintenance of places for draining water from a road, or a watercourse, if such are necessary, and if they are constructed and maintained so as to cause the least damage to the land. If the court accepted the Town's argument that the statute relates only to the creation of a drainage system, but not to its maintenance, then the Town would enjoy no statutory immunity for the maintenance of intrusive drainage system even if originally immune from liability for its construction. Such a result would be bizarre. In reviewing a statute, the court may presume that the legislature did not intend or promulgate a statute that leads to CT Page 278 absurd consequences or bizarre results. State v. Hill,237 Conn. 81 (1996). As the Town enjoys a statutory immunity for the maintenance of the means of drainage constructed in accordance with the dictates of C.G.S. § 13a-138, it enjoys no such immunity for the maintenance of a system that does not conform to those statutory parameters.
Furthermore, from the evidence, the court concludes that the original construction of the leak off at site six and the construction of cross culverts draining onto the plaintiffs' property was done for the ease of construction and not for the purpose of causing the least damage to the plaintiffs' property. The court credits, as reliable, the testimony of Donald Holmes that while the specific dates of the construction are uncertain, it took place between the 1930's and the 1950's. This testimony was based on Mr. Holmes personal recollection and his particular knowledge of Bunker Hill Road. In addition, the court accepts, as credible, Mr. Holmes' statement that the flowage of 1500 feet of water along the edge of Bunker Hill Road east of the Hutchinson property without some intermittent drainage was unusual, and the collection of flowage at one drainage site was not done so as to cause the least damage to the Hutchinson property. Additionally, the court credits, as reliable, Mr. Holmes' testimony that the utilization of six points of discharge, thereby concentrating the flow of surface water across the Hutchinson property, not only altered the natural sheet flow of surface water, but, as a result of the concentrations of flowage, caused unnecessary damage to the property. The court accepts Mr. Holmes' testimony that this point of discharge system of drainage was not the manner of eliminating surface water least likely to damage the plaintiffs' land.
While appearing to concede that the drainage system constructed and maintained by the Town does, in fact, cause drainage of surface water onto the house lot, the defendant asserts that the plaintiffs erected their home on this lot after they had already purchased their land and with knowledge of the pre-existing drainage onto the portion they allocated as a house lot. Since the Town's right to drain surface water from the road does not give it any rights over the land, but merely saves it from liability so long as its conduct conforms to the terms of C.G.S. § 13a-138, the plaintiffs did not subdivide their property and build their home subject to any prior encumbrance in favor of the Town. Also, the defendant's assertion is factually incorrect. A review of the map prepared for the plaintiffs by CT Page 279 Holmes Henry Associates in 1989 demonstrates that none of the drainage sites is located within the boundaries of the house lot. While the court finds that drainage from the system constructed by the Town, particularly drainage site three, presently causes drainage onto the house yard, there is no credible evidence that the drainage from any of the sites had reached the house lot by the time of its construction. Rather, the better evidence is that the flowage of water from drainage sites six, five, four, and three, has increased over time reaching further into the plaintiffs' property. At the time the plaintiffs erected their home, it was not their responsibility to foresee the eventual detrimental consequences of the Town's drainage system upon their house yard.
The plaintiffs seek equitable and legal relief. As legal relief, the plaintiffs seek monetary damages on the basis of evidence that the Town-constructed drainage system has diminished the value of their land. In support of their monetary claim, the plaintiffs adduced testimony from Gene Sammartino, a real estate broker, builder, and developer, that damage to the plaintiffs' property has diminished its fair market value by $172,000. Mr. Sammartino based this opinion on his belief that the extant drainage system and the damage caused by it has reduced the value of the plaintiffs' frontage on Bunker Hill Road and has diminished the amount of the plaintiffs' property available for development. He expressed the belief, in light of Town Subdivision regulations, that the incursion of drainage onto the plaintiffs' property by the artificial creation of channels, has reduced the legally usable percentage of the property. The plaintiffs presented, as documentary evidence, the Inland Wetlands and Watercourses Regulations of the Town to inform the court that the continuing encroachment of drainage on their land may cause more of their property to fall within the regulatory authority of the Town's Inland Wetlands Commission. Plaintiffs' Exhibit 6. The plaintiffs also assert credibly that because the Town's remediation proposal is likely to increase flowage at drainage site six, this flowage may constitute a regulated activity in accordance with the terms of the Regulations, thus removing more property from development potential.
Though not rejecting the plaintiffs' economic claims concerning the impact of the Town's drainage system on their property, the court believes, from the testimony adduced at trial, that abatement of the harmful and unnatural discharges will result in the restoration of the property without further CT Page 280 physical intervention. Since the plaintiffs' damages concerning the diminution in value of their land may be negated by the restoration of the land, the court believes that a present award of money damages is unwarranted. Therefore, the court reserves judgment on the issue of monetary damages in order to provide the defendant a reasonable opportunity to implement a drainage system that will cause the least damage to the plaintiffs' land, and that will result in a cessation of drainage onto the house lot. Similarly, while the court accepts, as proven, the plaintiffs' evidence that they have been required to purchase bottled water for their household consumption at an annual cost of approximately $182 since 1990, the court similarly reserves judgment on this further aspect of the plaintiffs' legal claim. The court continues the hearing on the plaintiffs' legal claims until February 3, 1998 at 10 a.m., when the parties shall appear in court for the court to hear further evidence and argument on the issue of money damages due to the plaintiffs from the defendant. It is the court's finding that if, by such date, the defendant has installed a drainage system in accordance with the terms of the mandatory injunction issued as part of this decision, the plaintiffs will not be entitled to an award of money damages for the diminution in value of their real property.
The plaintiffs seek an injunction to restrain the Town from draining surface water upon their property in a manner which does not cause the least harm to their property. Injunctive relief may be granted where there is irreparable harm and no adequate remedy at law. In this case, the plaintiffs have proven both. While the plaintiffs adduced credible testimony concerning the diminution in value of their property caused by the drainage of flowage from Bunker Hill Road onto their property by the Town, the court also heard credible evidence and finds that damage to the land is ongoing and accelerating as the erosion and channeling of the land encroaches further upon it. Additionally, the court is satisfied that the issuance of an injunction to stop the Town from causing drainage onto the plaintiffs' property is the only remedy that will adequately protect the plaintiffs' interest in their property. Accordingly, a mandatory injunction may issue permanently enjoining the Town from causing drainage of surface water from Bunker Hill Road onto the plaintiffs' property in a manner which does not cause the least damage to their property. The defendant is further permanently enjoined from causing any drainage onto or across the house lot.
The defendant is ordered to prepare a plan of drainage which CT Page 281 has, as features, elimination of artificial means of drainage from Bunker Hill Road from any point adjacent to the plaintiffs' property along Bunker Hill Road east of the present drainage site one. The Town is further ordered to complete construction of such a plan on or before December 31, 1997. If this drainage plan incorporates drainage at or near the present drainage site in the flood plain adjacent to the Hop River, the Town's plan shall also include provision for the installation and maintenance of a sediment pond adequate to prevent the flowage of salt and/or road sedimentation into the Hop River. During the hearing, the plaintiff Katherine Hutchinson testified that she would permit the Town to construct a sediment pool on this portion of the property. Given the plaintiff's testimony in this regard, and notwithstanding the fact that construction of this pool may diminish the useful portion of the plaintiffs' property at its western boundary, the Town shall not be liable to compensate the plaintiffs for any claimed-taking in regard to the construction and maintenance of this sediment pool.
Since compliance with the terms of this mandatory injunction will likely entail the construction of a sediment pond on the plaintiffs' property adjacent to the Hop River, the defendant is ordered to provide advance written notice to the plaintiffs of the dates and the scope of intended construction on the property. Additionally, the defendant is ordered to provide periodic written reports to the plaintiffs, not less than once quarterly, of its progress in the development and implementation of its plan of drainage. The first such report shall be provided no later than April 1, 1997.
In order to adequately present their claim for equitable relief, the plaintiffs have incurred substantial expert fees. The court finds that it was reasonable for the plaintiffs to incur fees for the litigation-related efforts of Gene Sammartino, Donald Homes, John Ianni, and Ellis Tarlton. The court notes that Mr. Sammartino, Mr. Ianni, and Mr. Holmes all walked the property, and the court was aided, in its decision, by their testimony concerning the condition of the property. Additionally, Mr. Sammartino took a number of photographs depicting the drainage onto the property and resultant damage to the soil. These photographs were helpful to the court in its determination to issue an injunction.
While the court has not fixed any amount to the economic damages suffered by the plaintiffs for the diminution in value of CT Page 282 their property because compliance with the terms of the injunction will negate such damages the court was aided in its decision to grant equitable relief by Mr. Sammartino's testimony concerning the diminished value of the property, together with testimony that the damage to the property is having a progressive impact. Mr. Sammartino has billed the plaintiffs the total sum of $3500, an amount which the court finds to be fair and reasonable.
Similarly, the court was aided in its decision to grant equitable relief by the testimony of John Ianni concerning the continuing impact of the Town's drainage on the plaintiffs' land, with particular regard to the likely increased impact on the wetlands, and the progressive deterioration of the soil by erosion if the artificial drainage of surface water from Bunker Hill Road onto the plaintiffs' property is not abated. The court finds Mr. Ianni's total billing of $1200 to be fair and reasonable.
Donald Holmes, who is a civil engineer, prepared a map depicting the plaintiffs' property where it abuts Bunker Hill Road, and showing the location of each of the six drainage sites. In addition this map has contour lines, and it shows the location of wetlands on the plaintiffs' property. Finally, Mr. Holmes and his staff noted on this map the areas of sediment deposit on the plaintiffs' property in 1989. Later, Mr. Ianni was able to augment this map with a portrayal of the extended incursion of drainage onto the property by 1996. This map and Mr. Holmes's testimony were helpful to the court in its determination to grant equitable relief. The court finds his total fees of $4727.50 to be fair and reasonable.
Finally, with respect to expert fees, Ellis Tarlton, a civil engineer and a sanitary engineer, testified concerning the presence of infiltrates in the household water supply and the likely cause of these infiltrates as that relates to the Town's wintertime use of salt in its road sanding activities. He also provided evidence which was helpful to the court in determining the relationship between the presence of certain minerals in the household water and the flowage of surface water and water-borne sediment at specified drainage sites on the property. While Mr. Tarlton did not have an invoice with him in court, the parties agreed procedurally that the plaintiff could submit his billing to the court so long as the defendant had the opportunity to comment on its necessity and reasonableness. CT Page 283
In a civil action, while the court's authority to award costs is statutory, the determination to award costs in an equitable action is discretionary. cf. C.G.S. § 52-257 (e); Wilson v.Root, 80 Conn. 227 (1907). Accordingly, the court orders the defendant to pay to the plaintiffs the reasonable fees of Mr. Sammartino, Mr. Ianni, and Mr. Holmes in the aggregate amount of $9427.50. Additionally, the defendant is ordered to pay the reasonable fees of Mr. Tarlton.
The court is mindful that implementation of any plan of drainage by the Town may be required to comport to municipal, State, and Federal regulations and laws. The court, therefore, retains jurisdiction of this matter for any further hearings and rulings which may be necessary in light of the permanent injunction it issues. The court retains jurisdiction, as well, in order to issue any further orders, including sanctions, that may be necessary in order to effectuate the provisions of this mandatory injunction.
Judgment may enter accordingly on the plaintiffs' claim for equitable relief.
Bishop, J.